# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 13, 2010 Session

## STATE OF TENNESSEE  v. CORINIO PRUITT

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-00460   Chris B. Craft, Judge**

———————————

**No. W2009-01255-CCA-R3-DD  - Filed June 13, 2011**

———————————

Capital Appellant, Corinio Pruitt, appeals as of right from his conviction for first degree felony murder and his sentence of death resulting from the August 2005 death of Lawrence Guidroz.  On February 29, 2008, a Shelby County jury found the Appellant guilty of one count of second degree murder and one count of first degree felony murder, and the trial court merged the conviction for second degree murder with the first degree murder conviction.  At the conclusion of the penalty phase, the jury unanimously found the presence of three statutory aggravating circumstances; specifically, (1) the defendant had previously been convicted of one or more felonies involving the use of violence, (2) the murder was knowingly committed while the defendant had a substantial role in committing a robbery, and (3) the victim was seventy (70) years of age or older.  See T.C.A. § 39-13-204(i)(2), (7), (14).  The jury further determined that these three aggravating circumstances outweighed any mitigating circumstances and imposed a sentence of death.  The trial court approved the sentencing verdict.  On appeal, the Appellant presents the following issues for our review:  (1) whether the trial court erred in failing to find the Appellant intellectually disabled[1] and ineligible for the death penalty, (2) whether the evidence is sufficient to support a conviction for first degree felony murder, (3) whether the trial court erred in permitting the introduction of the autopsy photographs of the victim, (4) whether application of the (i)(7) aggravating circumstance is constitutional, (5) whether the evidence is sufficient to support application of the (i)(7) aggravator, and (6) whether the sentence of death is proportionate in the present case.  After a thorough review of the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

———————————

[1]Pursuant to the Tennessee Supreme Court's opinion in Michael Angelo Coleman v. State, — S.W.3d — (Tenn.  2011), No. W2007-02767-SC-R11-PD, 2011 WL 1346932, at *30 n.5 (Tenn. Apr. 11, 2011) and the recently amended Tennessee Code Annotated section 39-13-203 (Supp. 2010), we will use the term "intellectual disability" rather than "mental retardation" except in quoted material where we will use the term specifically stated in the quotation.

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, and JOHN EVERETT WILLIAMS, JJ., joined.

Harry E. Sayle, III, and Tony N. Brayton, Memphis, Tennessee, for the Appellant, Corinio Pruitt.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; James E. Gaylord, Assistant Attorney General; William L. Gibbons, District Attorney General, Amy P. Weirich, Alanda H. Dwyer, and John W. Campbell, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**Evidence at Guilt Phase**

On August 2, 2005, Taka Pruitt rode to the Apple Market on Winchester Road in Memphis, Tennessee, with her neighbor to get a newspaper. When her neighbor went into the store, Pruitt stayed in the vehicle. She immediately recognized a young man, standing to the left of the door, because he lived in her apartment complex. About five minutes later, Ms. Pruitt saw an elderly gentleman walking out of the store with groceries. The elderly man walked toward his car parked to the side of the store. She then observed the young man, who had been standing outside the store, run after the elderly man. As the elderly gentleman opened his car door, the young man pushed him into the car. She saw the men "tussling" and saw "the [elderly] man's feet dangling . . . ." She then "saw the young gentleman throw the old man to the ground." The young man "slammed the door and took off in the car." Ms. Pruitt confirmed that the young man, who lived in her apartment complex, acted alone during this incident. She also stated that she never saw a teenaged male in a white shirt, later identified as Courtney Johnson, during the incident.

Ms. Pruitt ran into the Apple Market and yelled for someone to call 911. She then ran toward the victim as she dialed 911 on her cell phone. She immediately asked the man if he needed help. She saw that the elderly man was "shaking" and "looked like he was trying to breathe, but he couldn't." She noticed that "[b]lood was coming out of his nose and out of both his ears." Ms. Pruitt later identified the Appellant from a police photospread as the perpetrator of the August 2, 2005 beating of the victim, Lawrence Guidroz, at the Apple Market parking lot. She also identified the Appellant as the perpetrator at trial.

Michael Williams, the owner of the Apple Market, was informed by his employees of an altercation in the parking lot between 9:00 and 10:00 a.m. on August 2, 2005. When

he arrived outside, he saw an older man lying on the pavement. When Williams reviewed the store's surveillance video, he realized that the victim was a frequent customer at the Apple Market.

Thomas Leech, III, received a telephone call on August 2, 2005, from his wife, notifying him that their long-time family friend, seventy-nine-year-old Lawrence Guidroz, had been attacked and was being treated at St. Francis Hospital. By the time Mr. Leech arrived at the hospital, the victim had been taken to surgery. Leech said that the victim never regained consciousness after undergoing brain surgery. The victim subsequently died at 11:00 p.m. on August 3, 2005.

Memphis Police Officer Charmell Smith responded to the scene of the crime at the Apple Market on Winchester and Tullahoma on August 2, 2005. Upon arrival, he observed the victim, an older white male, approximately seventy-five to eighty years old, on the ground in the parking lot. Officer Smith stated that the victim was bleeding from his ears and was "semi-conscious." He immediately called for an ambulance.

Following the report of the victim's attack, Sergeant Robin Hulley began looking for the victim's missing vehicle, a gold or yellow Chevrolet Malibu. The vehicle was quickly found in a parking spot at the Somerset Apartments but was moved before the police could take further action. The vehicle was subsequently observed by an officer pulling into the garage of a house located at 3180 Beauchamp Drive. Sergeant Hulley and five other officers arrived at that location. Once there, Sergeant Hulley observed a man wearing a red shirt exit the vehicle and enter the house. While the officers were waiting for backup officers to arrive, another man, who was shorter than the driver of the vehicle and wearing a white shirt, exited the house. The officers immediately detained the man in the white shirt, who yelled, "The guy that you want is in the backyard." Sergeant Hulley and Lieutenant Clark then observed the man in the red shirt jump the fence, run through the backyard, and enter a wooded area. Additional officers, police dogs, and a helicopter were called to the scene to assist in the search of the man in the red shirt. One of the dogs later located a red shirt; however, the man who had worn the red shirt was not apprehended at that time. The man wearing the white shirt at the Beauchamp Drive address, later identified as Courtney Johnson, was taken into custody by the officers.

Courtney Johnson acknowledged at the Appellant's trial that he was currently incarcerated on a burglary of a vehicle charge. He said he lived with his grandmother at 3180 Beauchamp Drive in Memphis at the time of the offense in this case. At approximately 9:00 a.m., on August 2, 2005, Johnson walked to the Apple Market. On his way to the market, he encountered the Appellant. The Appellant told Johnson of his plans to steal a car and asked Johnson if he would get in the car with him if he did take one. The Appellant said

he intended to steal a car from a woman, and Johnson told him that he would not participate after the fact. The two walked to the Apple Market and stood near the drink machine in front of the store. The Appellant's cousin, Michael Rockett, walked up and spoke to them for a few minutes. The Appellant and Johnson stayed outside for approximately twenty minutes but did not see any female customers leaving the store. Then Johnson's friend "Sed" approached the store, and Johnson and "Sed" walked to the Family Dollar store nearby. Prior to leaving, Johnson saw an elderly man enter the Apple Market. Johnson claimed that he left the market with "Sed" because he was trying to distance himself from the Appellant. When Johnson returned to the Apple Market from the Family Dollar store, he saw "the old man [lying] down with blood coming out of his head, and his car, a brown Chevrolet, was gone." Johnson also noticed that the Appellant was gone. Johnson left the scene without talking to the police because he did not want to "snitch on [the Appellant]." He did not see the Appellant again until three days after the incident when the Appellant parked the victim's car in Johnson's grandmother's garage on Beauchamp Drive, and the police arrived. Johnson said that the Appellant told him at that time that he had "body-slammed" the victim in order to steal the victim's car.

Memphis Police Officer Francis Carpenter examined the victim's gold Chevrolet Malibu and obtained fingerprints from the windshield on the passenger side, the right rear fender, the trunk of the vehicle on the passenger side, and the left rear fender of the vehicle.

Nathan Gathright, a latent print examiner with the Memphis Police Department, examined the prints obtained from the victim's Chevrolet Malibu. He determined that the prints belonged to Mbenda McCracken, Kendricks Scott, and the Appellant, Corinio Pruitt.

Kendricks Scott saw the Appellant driving the Chevrolet Malibu in early August 2005. The Appellant called Scott over to the car and asked if he wanted a ride. Scott opened the back door of the car and got inside. The Appellant then told Scott that the car belonged to his aunt. Scott said that on the day after he saw the Appellant with the car he learned the Chevrolet Malibu was actually taken in a carjacking.

Mbenda McCracken stated that he saw the Appellant driving the Chevrolet Malibu in August 2005. The Appellant told McCracken that the car belonged to his girlfriend. McCracken got in the vehicle with the Appellant and "drove to the store, got a few beers, copped [sic] some weed[,] and rode around and got high" for three or four hours. McCracken learned that the vehicle had been taken during a carjacking either later that night or the next night. McCracken also stated that he saw the Appellant in a holding cell just prior to taking the witness stand, and the Appellant tried to persuade him to testify that someone other than the Appellant, presumably Courtney Johnson, drove the victim's car into the neighborhood and tried to sell parts from the car. McCracken said that the Appellant told

-4-

him that he and this other individual were trying to break into the victim's car, and when the victim came outside, they "grabbed him and threw him down."

Alma Rockett, the Appellant's aunt, said that the Appellant lived with her in the Somerset Apartments in Memphis in early August 2005. She first learned of the offense against the victim at the Apple Market when she was watching the local news on television. Rockett was shocked to see the Appellant and "another little guy, dark-skinned guy. . . come across the television screen." She also saw her son, Michael Rockett, in the video clip on television. Rockett and her son immediately went to the police department to inform officers that her son was not involved in the incident. The Appellant called Rockett after the incident, and she told him to turn himself into the police.

Dr. Karen Chancellor, the chief medical examiner for Memphis and Shelby County, performed the autopsy of the victim on August 4, 2005. She reported that the victim was five feet, seven inches tall and weighed one hundred and twenty-seven pounds at the time of his death. As a result of her internal and external examination of the victim, Dr. Chancellor concluded that the victim's cause of death was multiple blunt force injuries sustained to the head and to the chest. She explained that "blunt force injury is caused by a blunt object, perhaps a fist, a rock, a baseball bat . . . ." She further concluded that the victim's manner of death was homicide.

Dr. Chancellor stated that the victim had an abrasion on the front of his face and a laceration on the left side of his forehead. She also noted that "there [was] ecchymosis or hemorrhag[ing] around both eyes, and that was caused by skull fractures . . . found inside the body." Dr. Chancellor described injuries to the victim's body, including bruising on the ear, the left side of the chest and the upper arm, the right side of the chest, the neck and shoulder, the ankle, and the back of the left hand, the back of the right hand, and on the forearms. She also observed abrasions and bruises on the victim's lips. Dr. Chancellor opined that all the victim's bruises were caused at the same time. She also opined that the victim's injuries were sustained at the time of the incident at the Apple Market, which was just prior to his death.

Regarding her findings as to her internal examination of the victim, Dr. Chancellor noted that "there was quite a bit of hemorrhage overlying the ribs on the left side" and a complete fracture of the collarbone. Eleven ribs on the victim's left side were fractured, and there were resulting bruises on the surrounding lung tissue. Dr. Chancellor remarked that the victim had extensive blunt force injury to his head, which included skull fractures, bruises to brain tissue, and hemorrhaging around the brain. In addition, the victim suffered a subdural hematoma, which required surgery to avoid severe brain injury. Dr. Chancellor opined that the victim would have died if he had not undergone brain surgery. She also

opined that the skull fractures were caused by at least three separate blows or impacts to the left side of the head. The victim also suffered fractures to the orbital plates directly above the eyes, which resulted in blood around the eyes.

Although Dr. Chancellor said that she had no knowledge that the victim had a coagulopathy, a condition making him prone to bleed, she was aware that the victim had severe coronary atherosclerosis, a blockage of the blood vessels of the heart, and there was no evidence that the victim had ever had surgical intervention for these blockages. Dr. Chancellor stated that she did not collect any of the victim's fractured bones during the autopsy, since the practice of removing bones was not common. She stated that the victim's injuries were consistent with being beaten, but she was not able to determine the order of the victim's injuries. Dr. Chancellor also stated that she could not tell if the victim's injuries resulted from being struck by a hard object or being forcibly thrust against a hard object or whether the injuries resulted from a combination of these two actions. However, she opined that a fall alone would not have caused all of the victim's documented injuries. Dr. Chancellor stated that she did not do a bone density test on the victim because it was not a routine part of an autopsy. She also stated that although injuries to a person's skeleton were more likely with osteoporosis, the skull usually "maintains its density." She further opined that the victim could not have received his injuries from being pushed to the ground.

The defense presented the testimony of Dr. O. C. Smith, who served as the chief medical examiner for Shelby County until February 2004. In July 2007, Dr. Smith reviewed Dr. Chancellor's file on the victim. He noted that he was unable to examine the victim's brain specimen because it had deteriorated due to the absence of a preserving fluid. In reviewing the medical examiner's file for the victim, Dr. Smith noticed "a deviation from what [h]e had considered to be the standard of practice when [he] was with the office." Specifically, he stated that the victim's fractured bones were not properly preserved and that there were insufficient photographs taken of the victim's body. He further stated that the victim's case was not properly memorialized and, absent proper memorialization, any mistakes made by the medical examiner were "irremediable, irreversible."

Dr. Smith testified that the records from St. Francis Hospital indicated that the victim had coagulopathy and had lost 1.5 liters of blood during surgery. Dr. Smith opined that, for a person the size of the victim, this would have amounted to a thirty percent loss of the victim's blood. Dr. Smith also stated that the medical records showed that the victim had a ninety percent blockage in one of his major coronary arteries. This condition, in addition to the loss of 1.5 liters of blood, would have made the victim vulnerable to physiologic shock and extra strain on his heart. Dr. Smith also related that the victim had been given a blood transfusion consisting of "fresh frozen plasma and buttons of platelets[,]" which helped to clot blood in patients, like the victim, who had coagulopathy.

Dr. Smith opined that many of the injuries depicted in the autopsy photographs may have been caused by surgical intervention or hospital or EMT intervention. He added that, because of the victim's coagulopathy, "there may have been other seepages into his body . . . from spontaneous hemorrhag[ing] due to the fact he was not clotting his blood normally." Dr. Smith stated that some of the victim's bruises may have been the result of "senile ecchymoses" where "a simple push on the skin" can cause "superficial bleeding." However, he could not state whether specific bruises on the victim's body were from "senile ecchymoses" or were from "more forceful trauma."

Dr. Smith also found evidence of a "contre-coup" injury, or "decelerating" injury, which occurs when a moving head strikes a fixed object. Dr. Smith explained that a contre-coup injury would be consistent with a fall:

> The diagnosis in this is a contre-coup injury. This looks like a slow moving head hitting a flat object so that that can cause this type of fracture pattern as well as this pattern of damage. So you get the fractures from the impact of the head against the surface. It's a broad surface. It's not like it's hitting a bunch of projecting stones or something like that . . . .

Dr. Smith noted that the fractures to the victim's head, collarbone, and ribs were all on the left side. He added that, in his medical opinion, "these injuries are best explained by a fall to a flat surface or some contact where the body is in motion, and then it's been arrested by a hard, unyielding surface."

On cross-examination, Dr. Smith concurred with the medical examiner's finding that the victim's manner of death was homicide caused by blunt force injury to the head and chest. In addition, he conceded that the manner and cause of death contained in the autopsy report were consistent with the victim being pushed into a vehicle, feet-dangling out of the car, with the perpetrator on top of him, and then the perpetrator throwing the victim out of the car onto the concrete. Dr. Smith agreed that the blood coming out of the victim's ears at the scene of the incident indicated trauma to his ear or a skull fracture. Moreover, Dr. Smith conceded that if surgery not been performed at St. Francis Hospital, the victim would have died from his injuries.

In rebuttal, the State called Dr. Bruce Levy, the chief medical examiner for the State of Tennessee and the county medical examiner for Davidson County. Dr. Levy reviewed the autopsy report prepared by Dr. Chancellor. He opined that Dr. Chancellor properly memorialized the autopsy by photographing it, diagraming it, and providing a written narrative. He stated that these memorialization procedures complied with the standards of

the National Association of Medical Examiners. In addition, Dr. Levy stated that Dr. Smith's practice of removing and storing bones from the body was "pretty unique to Memphis even when it was happening there." Dr. Levy opined that the failure to store the bones in this case did not affect the accuracy of the autopsy because Dr. Chancellor documented the victim's injuries in other ways.

Dr. Levy stated that the victim in this case suffered blunt trauma injuries. He noted that there was no distinctive pattern to the injuries and that he was unable to tell the cause of the injuries. However, he opined that it would be very unusual to sustain the type of injuries to the skull by tripping and falling down, given the extensive and complex nature of the injuries. Although he acknowledged that the type of injuries sustained by the victim could have been caused by a car collision, a fall from a height, a high speed impact or some other source, he stated that it was important to look at the circumstances of the particular case because they could provide reasonable explanations as to the cause of the injuries. Dr. Levy opined that the victim could have suffered his rib fractures if he had been body-slammed onto the concrete parking lot but could not have suffered these injuries from a simple trip and fall. In addition, he agreed with Dr. Chancellor's findings that the victim's injuries were consistent with being beaten and then thrown to the ground. Finally, he opined that "the complexity and number of the fractures" indicated "a significant amount of force, much greater than you could possibly get from simply falling to the ground and striking your head on a flat surface." Dr. Levy acknowledged that if the victim had a particularly fragile skull, it would affect the severity of the fractures.

The Appellant, Corinio Pruitt, testified in his own defense at trial. He acknowledged that on March 7, 2003, he had been convicted of aggravated burglary, robbery, criminal attempt to commit robbery, and theft over $500, all unrelated to the instant case. He stated that on the date of the offense, he left for work around 6:00 a.m. Once he arrived at work, he realized that he had left his identification badge at home. He called his aunt and told her that he was on his way to the house to get his badge; however, he did not return to his aunt's home. Instead, the Appellant took the bus to Johnson's home on Beauchamp Drive. He arrived at Johnson's home around 8:30 a.m., and he and Johnson agreed to walk to the Apple Market. Upon arriving at the market, the Appellant and Johnson stood around the drink machine outside while they looked for a car to steal. The Appellant said that his cousin, Michael Rockett, arrived at the store a few minutes later. Rockett went into the Apple Market, and when he was done shopping there, the Appellant, Johnson, and Rockett walked over to the Family Dollar. After Rockett left, the Appellant and Johnson returned to the drink machine outside the Apple Market where they again began looking for a car to steal.

The Appellant claimed that he and Johnson walked toward the other side of the Apple Market because Johnson did not want to be seen on the Apple Market's surveillance camera. He also said that Johnson had been "scoping" out the car of an elderly man who had entered Apple Market. Johnson climbed inside the man's car, and the Appellant saw the elderly man exiting the store and walking toward his car. When the elderly man arrived at his car, he began "struggling with" Johnson. The Appellant said he ran up to the car, grabbed the elderly man, and "slung him to the car, and I guess when he hit the car, he fell." The Appellant stated that he was "so scared" that he got in the man's car and drove it back to Johnson's house. He confirmed that Johnson was not in the car when he drove it to Johnson's grandmother's house. Once Johnson got back to his grandmother's house, the Appellant went home. The Appellant said that Johnson called him the next day on August 3, 2005. At that time, the Appellant admitted that the car had been moved to the Somerset apartment complex where he lived, but he denied moving it there. He claimed that when Johnson came over to his apartment on August 3, 2005, Johnson picked him up in the victim's car, drove to his grandmother's home on Beauchamp Drive where he resided, and parked the car in her garage. The Appellant said that he stayed at Johnson's house until the police arrived. The Appellant admitted that he was the individual who ran from the police at the home on Beauchamp Drive. The following day, August 4, 2005, the Appellant said that he turned himself into the police. The Appellant said that he had initially planned on selling the parts from the victim's car.

On cross-examination, the Appellant stated that at the time of the incident he was twenty-five years old, but he was unsure about Johnson's age. Although the Appellant acknowledged telling the police that he approached the victim alone, he maintained at trial that Johnson was with him when he stole the victim's car. He further admitted telling the police that he took the victim's car back to his apartment because he knew he could not leave it at Johnson's grandmother's house the day of the offense. The Appellant conceded that he threw the victim to the ground before taking the victim's car. He also acknowledged that he never informed the police that the reason he threw the victim to the ground was because the victim attacked Johnson when he realized Johnson was trying to steal his car. The Appellant claimed that he omitted this information because he did not want to "snitch" on Johnson.

At the conclusion of the proof, the jury returned verdicts finding the Appellant guilty of first degree felony murder and second degree murder. The trial court then merged the second degree murder conviction with the first degree felony murder conviction.

### Evidence at Penalty Phase

The State presented the testimony of Marie Leech, the wife of Thomas Leech and a family friend of the victim. Mrs. Leech stated that she had known the victim for over twenty-

-9-

five years and saw him several times a week, including at church. She said that the victim was her daughter's godfather and would often visit the Leech home and would attend activities with the Leech family outside the home. She said the victim attended different churches all over Memphis. The victim visited his mother daily at the nursing home, and after her death, he continued to go to the nursing home to take care of other elderly people. She said the victim had lived in the Oakhaven neighborhood for over forty years, and people in the neighborhood called him "Mr. G." The victim would give his neighbors fresh herbs from his garden or something made in his kitchen, and he would give children change or flowers to give to their mothers. He was often seen picking up trash on the road in his neighborhood.

Alice Robinson, a deputy court clerk with the Shelby County Criminal Court Clerk's office, testified that on March 7, 2003, the Appellant was convicted of robbery and received a sentence of three years. On the same date, he was also convicted of attempted robbery and received a sentence of two years. In addition, on September 29, 1997, the Appellant was convicted of two counts of aggravated robbery and received a sentence of eight years for each conviction. On September 27, 1997, the Appellant was convicted of aggravated robbery and received a sentence of eight years.

In mitigation, the Appellant presented the testimony of Dr. Rebecca Caperton Rutledge, a clinical psychologist board-certified in forensic medicine and forensic evaluation. On November 18, 1996, she performed a psychological screening of the Appellant while he was incarcerated at the juvenile court. During this 1996 screening, Dr. Rutledge administered a Slosson Intelligence Test, a Bender Visual Motor Gestalt Test, and a Rorschach Psycho-diagnostic Technique test to the Appellant. She stated that "[t]he [Slosson] intelligence testing results yielded an I.Q. of 66, which is in the mildly mentally retarded range, the upper range, but mild mental retardation." She stated that someone "mildly mentally retarded" would tend to be impulsive and typically would not consider consequences that could arise from their actions. She noted in her report that the Appellant's test results may have been slightly lower than his actual level of cognitive functioning. In addition, her notes indicated that the Appellant was not "taking the process very seriously" and that he could have received better test results if he had put forth more effort. However, Dr. Rutledge opined that the Appellant "would have been in [the] range [of mild mental retardation] even if he had tried a little bit harder."

Dr. Rutledge noted that the Appellant had repeated the first grade, but she said that she did not have much other information about his educational background at the time she interviewed him. She opined that if a person suffered from "mild mental retardation[,]" their level of intellect would not get better but their level of functioning might improve.

Dr. Rutledge was asked to identify a September 22, 2006 report on the Appellant from the Middle Tennessee Mental Health Institute (MTMHI) Forensic Services Program. She stated that on September 22, 2006, Dr. Rokeya Farooque and Dr. Samuel Craddock at the MTMHI evaluated the Appellant and issued a report diagnosing the Appellant with "[m]ild mental retardation." Dr. Rutledge said that the MTMHI's diagnosis coincided with her 1996 diagnosis of the Appellant.

On cross-examination, Dr. Rutledge conceded that she did not have any particular memory of the Appellant during the 1996 screening. At that time, she did not find that he suffered from any mental illness that would keep the Appellant from being transferred to adult court. Dr. Rutledge conceded that she found no disorders when she administered the Rorschach test and the Bender Gestalt tests. She explained that the Slosson test was designed to provide an estimate of general verbal cognitive ability in a short time-frame. She admitted that there were other tests, including the two-hour Wechsler test, that were better at determining a person's I.Q. but that the juvenile court determined the tests she was allowed to give. She also acknowledged that her goal in giving the Slosson test was to determine whether the Appellant should be kept at the juvenile facility. She further acknowledged that the Slosson test, unlike other tests, did not have built-in standards for determining malingering. Dr. Rutledge stated that her report from the Appellant's 1996 screening made it clear that the Appellant thought the testing was a joke. She also acknowledged Dr. Farooque's finding on September 22, 2006, that the Appellant was exaggerating his mental illness symptoms. Other reports form the MTMHI indicated that the Appellant self-reported paranoid schizophrenia, although there was no record of the Appellant ever receiving treatment for the disorder. In addition, the MTMHI reports also indicated that the Appellant pretended to be afraid of the interviewers, and that "the results of the personality testing question[ed] the authenticity of [the Appellant's] reported mental illness." Dr. Rutledge conceded that the Appellant could have been deliberately underestimating his mental ability on the 1996 Slosson I.Q. test in order to avoid being sent to adult court. She acknowledged that the Appellant had many reasons to underestimate his mental ability at the MTMHI because he was facing capital murder charges at that time. She further acknowledged that her diagnosis did not mean that the Appellant did not know right from wrong. She admitted that the Appellant told her that he had never attended resource classes at school during the 1996 screening.

On re-direct examination, Dr. Rutledge said that the Appellant would have been given the Wechsler I.Q. test if he had been referred to her office after his screening. She further opined that, if the Appellant had been given that test, she believed his score on the Wechsler test "would have fallen pretty close to [his score on the Slosson test]."

-11-

The Appellant also presented the testimony of his mother, Vivian Pruitt. Ms. Pruitt testified that the Appellant's father was Terry McGirk. She stated that, at the time the Appellant was conceived, she was twenty-six years old and Terry McGirk was sixteen or seventeen years old. Ms. Pruitt stated that the Appellant's father had never spent any time with the Appellant and had never supported him. Ms. Pruitt stated that she loved her son and that if her son were given the death penalty, "[i]t would just kill me, too."

Ms. Pruitt stated that she had been addicted to drugs for seven or eight years while the Appellant was a child. She also admitted that she had been arrested several times, and she had one conviction for receiving stolen property and several convictions for public intoxication. She stated that her own mother, Frankie Timberlake, helped her care for Appellant and would care for him whenever she was incarcerated.

Ms. Pruitt said that several family members had mental health problems. She said that her mother had been "in and out of mental institutions" her entire life. She added that she personally had been a patient at the Memphis Mental Health Institute three times. She also stated that her grandmother's children had mental problems, one of her uncles died in a mental institution, and another uncle had mental problems. She said her sister and her brother suffered from mental problems, and both committed suicide.

Ms. Pruitt stated that, in addition to the Appellant, she had a daughter Quiana, a daughter Tapika, a son Rico, and a son, Antonio. She testified that Rico died of AIDS, and her daughter Tapika had been a patient in a mental institution and had attempted suicide several times.

Ms. Pruitt stated that she had married Walter Lee Pruitt, who was now deceased. During their marriage, Walter Pruitt went to jail a number of times, and their marriage lasted approximately six years. Although Walter Pruitt was close to the children, he left the marriage to be with another woman.

Ms. Pruitt stated that the Appellant had never held a job for more than a month. She admitted that she never had sought mental health treatment for the Appellant because she thought that he was a "normal child" with normal problems. She stated that the Appellant "didn't seem slow" to her. At the time of the offense in this case, the Appellant was living with Ms. Pruitt's sister, Alma Rockett. Although the Appellant had previously lived with Ms. Pruitt and her daughter Quiana in public housing, Ms. Pruitt said she was forced to have the Appellant to move in with Rockett after she and the Appellant had a dispute over disciplining his nephew.

On cross-examination, Ms. Pruitt stated that the Appellant was first arrested at age thirteen or fourteen and had many arrests thereafter. She claimed that the Appellant was in special education classes when he was in the fifth or sixth grade. However, she acknowledged that the Appellant's TCAP scores were high. She said that the Appellant stopped attending school after the seventh or eighth grade because he kept getting arrested and was placed in juvenile facilities.

Quiana Pruitt, the Appellant's sister, testified that she would be really hurt if her brother was given a sentence of death because they grew up together. She said that although she and the Appellant had the same father, their father had never spent any time with either of them. She described her childhood as "good off and on" but noted that there were times that they did not have electricity. Quiana Pruitt related that her grandmother was their primary caregiver when their mother was away and that their aunt, Alma Rockett, would often tell them that their mother was on drugs and did not want them.

Quiana Pruitt stated that their grandmother went to a mental institution because of Alzheimer's in 2000. She said that her sister, Tapika, had mental problems and one of Tapika's children had mental problems. In addition, she stated that one of her uncles and two of her aunts suffered from paranoid schizophrenia and were mental patients.

Ralph Nally, a criminal investigator, testified that he attempted to locate the Appellant's father, Terry McGirk. Although Nally never talked to McGirk directly, McGirk sent a message to him that he did not want to participate in the Appellant's proceedings.

In rebuttal, the State presented the testimony of Sandra Atkinson, the records supervisor at the Memphis City Schools. Atkinson reported that the Appellant enrolled in the first grade in the Memphis City Schools on September 9, 1987. The Appellant repeated the first grade, although the school records did not indicate why the Appellant was retained. Atkinson noted that the Appellant's test scores during his first time in first grade were high enough to be promoted to the second grade. While in the first grade, the Appellant took the California Achievement Test and scored in the eighteenth percentile in reading, the forty-fourth percentile in math, and the twenty-fourth percentile in word analysis. Atkinson opined that the Appellant's grades were normal for the first grade. During his second year in the first grade, the Appellant scored in the eighty-third percentile for the overall test, and scored in the sixty-first percentile in word analysis and the ninety-sixth percentile in math. Atkinson opined that these scores were "exceptionally high," especially in math. Atkinson additionally reported that, during his second year in the first grade, the Appellant was essentially a straight A student.

Atkinson testified that the Appellant missed twenty-seven days of school during his first year in the first grade and missed eighteen days of school during his second year in the first grade. Atkinson reported that, during April of his second year in the first grade, the Appellant transferred to LaRose Elementary School. The Appellant remained at LaRose Elementary through the sixth grade. Atkinson stated that the elementary school records did not show that the Appellant was in any kind of special education or resource classes. In her opinion, the Appellant "was an excellent student." Atkinson stated that he continued taking the TCAP while at LaRose Elementary. She reported the following grades and test scores for the Appellant while at LaRose Elementary:

| Year | Final Year Grades | TCAP Percentiles |
|------|-------------------|------------------|
| 2nd grade | A's and B's, and All S's (for satisfactory) and a couple of E's (for excellent) | Total Reading: 56th percentile<br>Total Math: 84th percentile<br>Total Word Analysis: 81st percentile |
| 3rd grade | All A's and E's, with the exception of one S | Total Reading: 69th percentile<br>Total Language: 89th percentile<br>Total Math: 94th percentile<br>Total Spelling: 31st percentile<br>Total Science: 51st percentile<br>Total Social Studies: 60th percentile<br>Total Battery: 88th percentile |
| 4th grade | All A's and B's; All E's and S's | Total Reading: 50th percentile<br>Total Language: 51st percentile<br>Total Math: 93rd percentile<br>Total Spelling: 71st percentile<br>Total Study Skills: 55th percentile<br>Total Science: 39th percentile<br>Total Social Studies: 52nd percentile<br>Total Battery: 69th percentile |
| 5th grade | All A's | Total Reading: 95th percentile<br>Total Language: 99th percentile<br>Total Math: 90th percentile<br>Total Battery: 98th percentile |
| 6th grade | One A, mostly Bs, and two C's (in reading and written composition) | Total Reading: 91st percentile<br>Total Language: 88th percentile<br>Total Math: 98th percentile<br>Total Spelling: 99th percentile |

| | | |
|---|---|---|
| | | Total Study Skills: 64th percentile<br>Total Science: 10th percentile<br>Total Social Studies: 97th percentile<br>Total Battery: 95th percentile |

In the seventh grade, the Appellant attended Vance Middle School. The Appellant remained at Vance Middle School until December 1, 1994, when he withdrew to attend another school in Tennessee. The Appellant then attended Colonial Middle School until he withdrew on January 13, 1995. The records indicated that the Appellant was only at Colonial Middle School for one week. The Appellant then returned to Vance Middle School and stayed there until May 5, 1995, when he withdrew to attend another school in Tennessee. Atkinson said that the Appellant did not finish school that year at the Memphis City Schools and was absent a significant number of days during his seventh grade year. However, before withdrawing from Vance Middle School, the Appellant took the TCAP test in April of his seventh grade year. His scores were as follows:

Total Reading: — (Appellant was absent the day the test was administered)
Total Language: 19th percentile
Total Math: 21st percentile
Total Spelling: no score/test
Total Study Skills: 42nd percentile
Total Science: 8th percentile
Total Social Studies: 22nd percentile

Atkinson stated that, because the Appellant failed to complete the seventh grade year, she did not have any grades for him. Nevertheless, the Appellant was promoted to the eighth grade at Vance Middle School but did not enroll there until November 2, 1995. The Appellant withdrew from Vance Middle School for non-attendance on January 30, 1996. During his brief time in the eighth grade, his grades declined. On April 26, 1996, the Appellant's records were sent to an alternative school. Atkinson explained that students were sent to an alternative school for either non-attendance or behavior problems. She also stated that there was nothing in her records that indicated that the Appellant ever attended special education or resource classes. The Appellant repeated the eighth grade in 1996 at Bellevue Junior High School. Ultimately, the Appellant was withdrawn from that school by court order after attending school there for less than two months. She did not have any TCAP scores for his eighth grade year at Bellevue. Atkinson stated that when the Appellant attended school, "he was an excellent student."

In surrebuttal, the Appellant recalled his mother, Vivian Pruitt. Ms. Pruitt explained that the Appellant fell on his head when he was in the fifth grade. The Appellant was taken to the hospital and examined for a head and neck injury, but no tests were taken, and the Appellant later complained of headaches. Ms. Pruitt testified that she "just didn't push the issue [regarding his head injury] because [she] didn't think it was that serious." Ms. Pruitt also reported that four of the Appellant's best friends were killed in an automobile accident in the seventh grade, and the Appellant went to the particularly gruesome scene of the accident. She said that the Appellant "didn't act so good [sic]" after the accident. She added that, in hindsight, she "should have paid more attention to him or something."

On cross-examination, Ms. Pruitt stated that she did not believe that the Appellant knew right from wrong. She explained that the Appellant did not act like himself after losing his friends in the car accident. She added that her son, Rico, died from AIDS during this period as well. She opined that "[a]ll of that might have affected him."

Ms. Pruitt's testimony concluded the proof at the penalty phase. The trial court then instructed the jury as to the following statutory aggravating circumstances:

> One, the Defendant was previously convicted of one or more felonies other than the present charge the statutory elements of which involved the use of violence to the person.

> The State is relying upon the crimes of aggravated robbery, robbery and criminal attempt robbery, the statutory elements of which involve the use of violence to the person.

> Two, the murder was knowingly committed, solicited, directed or aided by the Defendant while the Defendant had a substantial role in committing or attempting to commit, was fleeing after having a substantial role in committing or attempting to commit, a robbery.

> Knowingly means that a person acts knowingly with respect to the conduct or the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist.

> A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. The requirement of knowingly is also established if it's shown that the Defendant acted intentionally.

Intentionally means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

Three, the victim of the murder was seventy years of age or older.

See generally T.C.A. § 39-13-204(i)(2), (7), (14).

The court also instructed the jury as to the following mitigating circumstances:

One, the capacity of the Defendant to appreciate the wrongfulness of his conduct or conform his []conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment.

Two, the youth of the Defendant at the time of the crime.

Three, the Defendant has a family whose members have expressed love and support.

Four, the Defendant's formal education is limited to completing the seventh grade of school.

Five, the Defendant's father has never been a part of the Defendant's life.

Six, the Defendant's family for three generations may have suffered from mental illness and drug/alcohol addiction.

Seven, the Defendant's mother was arrested for receiving stolen property when the Defendant was two years old and ha[d] many arrests thereafter.

Eight, the Defendant experienced significant deficits in his adaptive behavior.

Nine, the Defendant's I.Q. has been measured at 66, and he was diagnosed as mildly mentally retarded when he was age sixteen.

Ten, the Defendant was diagnosed as being mildly mentally retarded by the Middle Tennessee Mental Health Center.

Eleven, the Defendant suffers from schizophrenia, has made suicide attempts and has a family history of schizophrenia.

Twelve, the Defendant has expressed pressure and stressors leading up to the crime.

Thirteen, the Defendant did not intentionally kill [the victim].

Fourteen, the Defendant did not premeditatively kill [the victim].

Fifteen, the failure of our social system to protect and school the Defendant.

[Sixteen], the failure of our mental health system to treat the Defendant.

Seventeen, the neglect and abandonment of the Defendant during his childhood.

Eighteen, the trauma produced by loss during the Defendant's childhood.

Nineteen, the Defendant has expressed remorse for his action.

Twenty, any residual doubt that remains with you concerning the guilt or intent of the Defendant.

Twenty-one, the Defendant possibly was prenatally exposed to drugs and alcohol.

Twenty-two, the impact of an execution of the Defendant upon his family members.

Twenty-three, any other mitigating factor which is raised by the evidence, produced by either the Prosecution or Defense at either the guilt or sentencing hearing. That is, you shall consider any aspect of the Defendant's character or record or any aspect of the circumstances of the offense favorable to the Defendant which is supported by the evidence.

See generally T.C.A. § 39-13-204(j)(7), (8), (9).

After receiving the instructions, the jury retired to consider their verdict. Following deliberations, the jury found that the State had proven all three of the aggravating circumstances, (i)(2), (i)(7), and (i)(14), beyond a reasonable doubt. See id. § 39-13-204(i)(2), (7), (14). The jury further found that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. In accordance with their verdict, the jury imposed a sentence of death.

## I. Intellectual Disability

The Appellant contends that the trial court erred in determining that he had not proven his intellectual disability by a preponderance of the evidence and, therefore, was eligible for the death penalty. First, regarding the factor requiring subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below pursuant to section 39-13-203(a)(1), the Appellant argues that the trial court erroneously "incorporated a range of error measurement in the test scores" in violation of Howell v. State, 151 S.W.3d 450, 458-59 (Tenn. 2004), in finding that his I.Q. score of 66 by Dr. Rutledge and his I.Q. score of 68 by Dr. Craddock were unreliable. Second, regarding the adaptive deficits factor in section 39-13-203(a)(2), the Appellant contends that the proof established that he was unable to live independently, could not keep a job, and was unable to abide by society standards because of his frequent arrests. He asserts that the trial court's contrary finding "relied heavily upon a glimpse of his school records and the often combative, hostile and evasive testimony of Dr. Craddock." Finally, the Appellant argues that his intellectual disability manifested itself prior to his attaining the age of eighteen.

In response, the State argues that "[t]he standard error of measurement reflects the reliability of the testing instrument itself" while the trial court's determination that the Appellant's scores were the result of malingering "relates to the reliability of a particular administration of a test, and simply addresses the weight of the evidence."

Moreover, the State contends that the evidence does not preponderate against the finding of the trial court that the test scores were unreliable and that the Appellant provided no substantial evidence of deficits in adaptive behavior. We agree with the State.

### A. Motion Regarding Intellectual Disability

At the close of the proof at the penalty phase but prior to closing arguments and the submission of the case to the jury, the Appellant made an oral motion that the trial court remove the consideration of the sentence of death from the jury due to the intellectual

disability of the Appellant pursuant to Tennessee Code Annotated section 39-13-203. The trial court noted that neither the court nor the State had been provided notice that a motion pursuant to section 39-13-203 would be made. The court also asserted that this motion should have been filed pre-trial, with proper notice given. The State likewise objected that it had not been given proper notice. Defense counsel asserted that they would rely upon the mitigation proof tendered as the basis of the motion. Ultimately, the trial court declined to rule on the motion because it was not properly before the court.

After the jury returned a sentence of death, the Appellant filed a timely motion for new trial on March 27, 2008. In the motion for new trial, the Appellant contested the trial court's refusal to rule on the oral motion to disallow the consideration by the jury of the death penalty in view of the notice given to the State and the showing by the Appellant that he suffered from a mild intellectual disability. The trial court determined that it would grant the Appellant time to consider whether or not he wished a hearing on the intellectual disability issue. On July 17, 2008, the Appellant filed a motion for a hearing, arguing that the State had been given proper written notice, pre-trial, of his intent to use his condition of intellectual disability as a defense. He further asserted that both the MTMHI and Dr. Rebecca Rutledge examined him and found him to suffer from "mild mental retardation."

The trial court held a hearing on December 12, 2008, on the Appellant's motion to remove the death penalty pursuant to section 39-13-203 based on the Appellant's intellectual disability. At the hearing, the defense rested on the proof presented during the penalty phase of the trial. The State presented the testimony of expert Dr. Larry Craddock, a clinical psychologist with the MTMHI. Dr. Craddock testified that he was asked to perform an evaluation of the Appellant, who was at the MTMHI from August 31, 2006, to September 27, 2006. During these twenty-eight days, Dr. Craddock and other staff members had the opportunity to observe the Appellant "around the clock."

As part of his evaluation, Dr. Craddock administered "some intelligence tests, some aptitude tests, and a personality test." He specified that "[t]he test of intelligence was a Wechsler adult intelligence scale, third edition." Dr. Craddock reviewed "the probable cause statement, homicide witness statements, crime scene reports, . . . incident reports from the police, police narratives and supplements, the . . . statement of Miss Johnson, homicide defendant['s] statement, report from the medical examiner, [and the] motor vehicle sentencing score sheet" as well as the "Shelby County detention facility booking summary, notice of impeachment, telephone interviews with the [Appellant's] mother, [and the] Midtown Mental Health Center's forensic evaluation of [the Appellant]." Dr. Craddock stated that he prepared a staff conference report on September 22, 2006, which contained his findings regarding the Appellant:

It was our impression at the end of our evaluation that he was competent to stand trial. That he was not considered committable to a psychiatric facility because of being a danger to himself or others. And that we were unable to show that we could support a defense of insanity for the event that occurred on August 2nd or 4th, and it has here 2006. It would be correct to say 2005 is when the incident happened.

He explained the diagnoses found in his staff conference report on the Appellant:

> [Regarding] Axis I, . . . Dr. Farooque was impressed with what [the Appellant] had said about showing signs of a psychosis or serious major mental illness. She had proposed a diagnosis of schizophrenia and differentiated-type because he said that he was responding well to medications. The voices that he said that he was hearing had been improving. He didn't feel as though his thoughts were so disorganized.
>
> [The Appellant] ha[d] a history of cannabis abuse and cocaine abuse so that was added under axis I, and then on axis number II, it is typed there mental retardation mild, and I have since really written a note to the effect that that [diagnosis] was in error, as it was also in the psychological report, and [the diagnosis] was corrected to borderline intellectual functioning.

Dr. Craddock explained that on August 8, 2008, he filed an addendum to the staff conference report stating that the axis II diagnosis of "mild mental retardation" was in error and that his intention was to state borderline intellectual functioning as the Appellant's diagnosis.

Dr. Craddock testified that before a diagnosis of "mental retardation" is made, there must be a finding of "subaverage intellectual functioning, as demonstrated by intelligence testing where the I.Q. falls below 70." He explained that "[t]here is a little bit of latitude in there, and there [are] some impairments in the adaptive level of functioning where the person shows an inability to function at their peer level in the community in a variety of different ways, impaired communication, and then also it is to be diagnosed before the age of eighteen."

Dr. Craddock explained how the staff at MTMHI arrived at the diagnosis of borderline intellectual functioning for the Appellant:

> Well, one part of it was the testing that occurred while he was with me, that I did not get the impression that he was coming across just trying to give a completely deceptive impression of his functioning. That some people who

present for testing are obviously malingering or trying to give a deceptive impression. [The Appellant] did not come across as some individuals do. So, I had my testing, as well as we had material from the Department of Correction[] which had [the Appellant's] score [of] 81 and that falls within the borderline level of intellectual functioning.

Dr. Craddock said that the Department of Correction score was from a Beta Test taken by the Appellant when he was 18 years old and incarcerated. He stated that the Appellant had been given the Beta Test because the Appellant had expressed interest in earning his GED while incarcerated and learning about small engine repair. The Appellant's Beta Test score revealed that he was reading at an eighth grade level, spelling at a high school level, and understanding math at a fifth grade level.

Dr. Craddock testified that he received records that the Appellant had completed the sixth grade in the Memphis City Schools. He said that the Appellant had reported a ninth grade education to the Department of Correction, but the school records did not corroborate this assertion. Dr. Craddock stated that school records routinely show if a student had undergone formal psychological testing indicating that the person had scored two standard deviations below the means, which required these students to be placed in special education classes. However, he stated that there was no evidence in the Appellant's school records that he had ever been placed in special education classes. Rather, Dr. Craddock stated that the Appellant's grades in school were good "right up to the sixth grade." He further said that after reviewing the applicable material, the Appellant "did not fall within the mild range of mental retardation[,]" and in fact, "[a] case could be made for him having average intellectual functioning." Regarding the adaptive deficits factor, he noted that the Appellant's mother had stated that the Appellant was fired from his warehouse job because "he was abusing his break privileges" rather than not "comprehend[ing] the instructions" or not knowing what was expected of him on the job. Ultimately, Dr. Craddock stated, "[W]e did not see somebody that was functioning in the mild range of mental retardation, particularly with the school grades." Moreover, he stated that "[t]here [were] TCAP scores, that I understand [were] in the 90+ percentile]" He concluded that he and the other staff members were unable to identify any deficits in the Appellant's adaptive behavior. In addition, he stated that he did not receive any information suggesting that the Appellant before the age of eighteen had "mild mental retardation" or an "adaptive deficit."

On cross-examination, Dr. Craddock acknowledged that he placed the Appellant's erroneous diagnosis of "mild mental retardation" on the staff conference report and on the psychological report. He stated that he could not provide a reason for his mistake regarding the Appellant's diagnosis. Dr. Craddock explained that the difference between "borderline intellectual functioning" and "mild mental retardation" were slight in terms of I.Q. scores:

-22-

"The I.Q. of 70 [or below for mental retardation] is given as a cutoff, but it is not absolute. If you look in the diagnostic manual, you will find out [the diagnosis for an individual] depending on the test that is given." He also confirmed that the Appellant's test results on the Wechsler adult intelligence scale indicated a full scale I.Q. of 68. However, he noted the Appellant "was giving quick responses where he didn't give time to think through the answers." However, Dr. Craddock stated that his psychological report showed that "[the Appellant's] reproductions of the Wechsler memory scale figures were representative of an individual's visual memory and visual perception deficits" and that "[i]t was not apparent [the Appellant] was making less than his best effort[.]" Moreover, regarding the Appellant's fifth grade score on the word recognition section and his mid-third grade score on the sentence comprehension sections of the wide range achievement test, Dr. Craddock noted that "[i]t was not apparent [that the Appellant] was making only a token effort and these results may likely reflect his true reading abilities." Nonetheless, Dr. Craddock stated that "there were portions of the Wechsler adult intelligence test where he just seemed to be . . . throwing out an answer[.]" He added that he believed a diagnosis of borderline intellectual functioning was proper because he did not believe that the Appellant's score on the Wechsler adult intelligence scale was "representative of someone with mild mental retardation."

Dr. Craddock was then asked to read from his August 8, 2008 addendum regarding the correction of the Appellant's diagnosis to borderline intellectual functioning:

> On Friday, August 8, 2008, [a] Shelby County [assistant district attorney] met with me at Forensic Services to discuss [the Appellant's] diagnosis. The Staff Conference Report and Psychological Report note an Axis II diagnosis of mental retardation, mild. Dr. Farooque's Discharge Summary gives an Axis II diagnosis of borderline intellectual functioning.
>
> I told Mr. Campbell, in the presence of Dr. Farooque, that what is given in the Discharge Summary, and is found in other discharge notes, the yellow sheet that goes to the FSP director of our findings, and in the red Ledger book, is border intellectual functioning, and this is the correct Axis II diagnosis.
>
> It is my error listing mild mental retardation as one of [the Appellant's] diagnosis [sic].

Dr. Craddock said that he realized his error regarding his diagnosis of the Appellant when one of the assistant district attorneys working on this case asked him to explain his diagnosis of the Appellant as "mild[ly] mentally retarded." He said that the diagnosis of "mild mental retardation" for the Appellant was likely a clerical error.

Regarding the Appellant's I.Q. score of 68 on the Wechsler test, Dr. Craddock stated that, depending on the test given, a person's actual I.Q. could fall within three to five points in either direction of the score they received on a particular test. In other words, he stated that by scoring 68, the Appellant's actual I.Q. could potentially be between 63 and 73. Dr. Craddock reiterated that the Appellant was giving "very quick responses[,]" and he thought that the Appellant's I.Q. was actually higher than his score indicated. On the Appellant's psychological report, Dr. Craddock noted that the Appellant was answering "too fast" and "not thinking." He also noted on another part of the test that the Appellant was answering really fast, and his answers were "likely [an] underestimate."

Dr. Craddock explained that adaptive behavior is "[h]ow well a person functions in the community." He said adaptive behavior included things like being able to be gainfully employed, to shop for oneself, to make change accurately, and to make use of transportation. Dr. Craddock stated that typically one would determine adaptive deficits based upon interviews of the client and people that knew the client. He added that there was the Vineland adaptive behavior scale and a few other tests for adaptive behavior, but he did not employ these tests in the Appellant's case.

When asked to look at Dr. Farooque's discharge summary for an explanation of why she diagnosed the Appellant with borderline intellectual functioning, Dr. Craddock stated that Dr. Farooque did not provide a reason for her diagnosis. However, he stated that Dr. Farooque noted in the report that the Appellant had a history of hospitalization since the age of fourteen and had been doing well at age twelve and thirteen before he started deteriorating. When asked if he knew the reason for the Appellant's deterioration at the age of twelve or thirteen, Dr. Craddock stated:

> My impression from what material I have [is that] he started using drugs around that time and found less interest in school[,] and I guess his values changed. He didn't show the interest in . . . committing himself to schoolwork that he had earlier.

However, Dr. Craddock acknowledged that the Appellant could have also deteriorated at that age because of some kind of injury.

On re-direct examination, Dr. Craddock stated he immediately told the assistant district attorney that he had made a mistake with his diagnosis of the Appellant at the beginning of their first meeting. He confirmed that the Appellant was never actually diagnosed with "mild mental retardation," but that this diagnosis was the result of a clerical error. He also stated that a determination of whether someone suffers from "mild mental retardation" is not based merely on that person's score on an I.Q. test. In other words, Dr.

Craddock stated that a person could have an I.Q. score of 68 and not be "mental[ly] retard[ed]." He added that the MTMHI had previously had "a number of individuals who tested in that area[,] and we did not give [them] the diagnosis of mild mental retardation."

Dr. Craddock stated that "it would be unjustified to consider [the Appellant] mentally retarded." He stated that the Appellant self-reported playing chess, and he opined that an ability to play the game of chess "is not consistent with somebody who is mentally retarded." In addition, he noted that the Appellant's mother reported that the only reason the Appellant was terminated at his employment was "because he was abusing his privileges, not because he couldn't comprehend" and noted that the Appellant's "school records [did not] suggest mental retardation." He acknowledged that his testing was performed after the Appellant reached the age of eighteen. However, he concluded that there was "no reason to consider [the Appellant] mildly mentally retarded."

On recross examination, Dr. Craddock stated that he questioned whether the Appellant's scores were representative of his intellect:

> I would question the [Appellant's] scores because mentally retarded individuals, which I think you are suggesting that he might be, typically score high on performance and low on verbal. He was just the opposite. When you score low on performance, there is an implication there that you may not be making your best effort. So, if you look in the textbooks, time after time, mentally retarded people, they have poor[er] verbal, math skills, and so forth than they do manipulation skills, visual skills, but that was not the case with [the Appellant].

The hearing was continued to January 16, 2009. At that time, the defense recalled Dr. Rebecca Rutledge. Dr. Rutledge was questioned regarding the I.Q. test she administered to the Appellant when he was sixteen years old. Dr. Rutledge stated that she concluded that the Appellant had a full scale I.Q. of 66 during the 1996 screening. She said that she had reviewed the psychological report of Dr. Craddock, which concluded that the Appellant had a full scale I.Q. of 68.

With regard to Dr. Craddock's assertion that there was some flexibility in diagnosing a person as either "mentally retarded" or borderline intellectual functioning, Dr. Rutledge explained Dr. Craddock may have been referring to the two prongs of the diagnosis, i.e., the factor regarding the I.Q. score of seventy or below and the factor regarding adaptive behavior deficits, or may have been referring to the statistics regarding the accuracy of a particular I.Q. score. She acknowledged that a person may still be diagnosed as borderline intellectual functioning if their adaptive skills are good, even though their I.Q. score is slightly less than

70 . Regarding the issue of adaptive skills, Dr. Rutledge recalled that the Appellant had fifth-grade reading skills and third-grade math skills. She said she was aware that the Appellant was unable to live independently, was unable to remain employed, and was unable to abide by community standards. She noted that Dr. Craddock's score of 68 on the I.Q. test and her score of 66 were very close.

On cross-examination, Dr. Rutledge conceded that her documentation of the Appellant's I.Q. score of 66 at the age of sixteen may have been an underestimate of his actual ability. She acknowledged that a diagnosis of "retardation" is not based only on a person's I.Q. score, since the diagnosis also included consideration of the person's adaptive functioning. She also acknowledged that she had not seen the Appellant since the 1996 screening that lasted no more than one hour and that Dr. Craddock, who was able to evaluate the Appellant for approximately one month, was in a better position than she was to evaluate the Appellant's adaptive deficits. Although she had previously testified that the Appellant was unable to maintain employment, she acknowledged that the Appellant was gainfully employed at the time he committed the offense in this case. Finally, Dr. Rutledge admitted that she had never reviewed the Appellant's school records which included TCAP scores showing that he had scored in the upper ninetieth percentile.

### B. Trial Court's Findings of Fact & Conclusions of Law

On May 22, 2009, the trial court entered an order denying the Appellant's motions for new trial and finding, following the post-trial hearings, that the Appellant had failed to demonstrate his intellectual disability pursuant to Tennessee Code Annotated section 39-13-203. As previously discussed, the defense first made an oral motion prior to the end of trial requesting that the trial court remove consideration of the sentence of death from the jury due to the intellectual disability of the Appellant. At the time, the trial court noted that neither the court nor the State had been provided notice that a motion pursuant to section 39-13-203 would be made. The trial court also asserted that this motion should have been filed pre-trial, with proper notice given. The trial court ultimately declined to rule on the motion during trial because it was not properly before the court.

In the May 22, 2009 order, the trial court resolved two issues: (1) whether the defense had a right to a hearing regarding the intellectually disability issue at the time of their oral motion prior to the end of trial, and (2) whether the Appellant was shown to be intellectually disabled pursuant to section 39-13-203, based on the evidence presented at trial and at the post-trial hearing. The court acknowledged that it would have to set aside the Appellant's sentence of death if he established by a preponderance of the evidence that he was intellectually disabled.

-26-

Regarding the Appellant's right to a hearing on the "mental retardation" issue during trial, the trial court found that this issue "should always be raised prior to trial, to avoid the extra expense and judicial resources needed to try a capital case when compared with a case in which the sentence of death has already been removed early on as a possible sentence." Noting State v. Strode, 232 S.W.3d 1, 10-11 (Tenn. 2007), the trial court stated that "[i]f a trial court allowed the mental retardation hearing to be heard at the conclusion of all the proof in a capital case, rather than prior to trial, the state would de facto lose its right to appeal any decision adverse to the state's position." The trial court also equated the request for a hearing on the "mental retardation issue" during the trial without notice to the State as "trial by ambush." The trial court noted that, in hindsight, it should have entered an order pursuant to Tennessee Rule of Criminal Procedure 12(c) setting a deadline for parties to make pretrial motions regarding the issue of intellectual disability. The trial court found that it had not erred in refusing to hear the motion at the conclusion of the proof during the penalty phase because the additional time allowed the State to properly prepare for the hearing and gather its expert witnesses.

The trial court found that the Appellant failed to prove by a preponderance of the evidence that he had significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below:

The two tests given the [Appellant] in 1996 and in 2006, according to the testimony of the two test-givers themselves, Dr. Rutledge in 1996 and Dr. Craddock in 2006, were not products of the [Appellant's] best effort, and especially in light of the [Appellant's] grades in school and social history are found by this court to be unreliable test scores. A functional I.Q. of seventy is not "evidenced" by either unreliable test result.

The trial court next found that the Appellant had not proved by a preponderance of the evidence that he had deficits in adaptive behavior:

No deficits in adaptive behavior of the defendant were ever shown in the proof, either at trial or during the hearings on this motion. In Dr. Rutledge's trial testimony, she testified that adaptive deficits were present in mentally retarded persons, but never stated any were present in the defendant himself. The defendant's mother testified that the defendant "stayed working. He was doing fine there." He was an excellent student until he began using drugs, had [sic] his friends killed, his brother died of AIDS[,] and began being absent from school and committing crimes. His mother said he seemed a normal child to her.

In addition, the trial court noted that Dr. Craddock testified that he did not see any deficits in the Appellant's adaptive behavior. Finally, the court determined that "[a]s the defense has not proved its burden of showing either of the first two prongs by a preponderance of the evidence, it has also not shown they were manifested by the time the defendant was 18 years of age." The court added:

> Although the defendant's test scores in school dropped or remained the same, there was no showing that this drop was due to deficits in adaptive behavior. His social history shows these lower scores were due to traumatic events in his life, drug use, incarceration[,] and absence from school.

In conclusion, the trial court determined that the Appellant had "not been shown to be mentally retarded pursuant to [Tennessee Code Annotated section] 39-13-203" and "decline[d] to set aside the jury's verdict of death."

## C.  Summary of Applicable Law

In 1990, the Tennessee General Assembly enacted section 39-13-203, which prohibited the execution of defendants with "mental retardation." See T.C.A. § 39-13-203(b) (Supp. 1990). In 2010, the statute was amended to replace the term "mental retardation" with "intellectual disability." See Act of Apr. 9, 2010, ch. 734, §§ 1-7, 2010 Tenn. Pub. Acts. The amended Tennessee Code Annotated section 39-13-203 provides, in part:

> (a) As used in this section, "intellectual disability" means:
>
> (1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;
>
> (2) Deficits in adaptive behavior; and
>
> (3) The intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age.
>
> (b) Notwithstanding any provision of law to the contrary, no defendant with intellectual disability at the time of committing first degree murder shall be sentenced to death.
>
> (c) The burden of production and persuasion to demonstrate intellectual disability by a preponderance of the evidence is upon the defendant. The

determination of whether the defendant had intellectual disability at the time of the offense of first degree murder shall be made by the court.

(d) If the court determines that the defendant was a person with intellectual disability at the time of the offense, and if the trier of fact finds the defendant guilty of first degree murder, and if the district attorney general has filed notice of intention to ask for the sentence of imprisonment for life without possibility of parole as provided in § 39-13-208(b), the jury shall fix the punishment in a separate sentencing proceeding to determine whether the defendant shall be sentenced to imprisonment for life without possibility of parole or imprisonment for life. The provisions of § 39-13-207 shall govern the sentencing proceeding.

(e) If the issue of intellectual disability is raised at trial and the court determines that the defendant is not a person with intellectual disability, the defendant shall be entitled to offer evidence to the trier of fact of diminished intellectual capacity as a mitigating circumstance pursuant to § 39-13-204(j)(8).

(f) The determination by the trier of fact that the defendant does not have intellectual disability shall not be appealable by interlocutory appeal, but may be a basis of appeal by either the state or defendant following the sentencing stage of the trial.

T.C.A. § 39-13-203 (Supp. 2010).

All three criteria enumerated in subsection (a) must be satisfied before a finding of intellectual disability may be made. See id. § 39-13-203(a). In addition, the defendant must prove intellectual disability by a preponderance of the evidence. See id. § 39-13-203(c). However, the trial court determines whether the defendant was intellectually disabled at the time he committed the offense of first degree murder. See id.

In 2001, the Tennessee Supreme Court held in Van Tran v. State, 66 S.W.3d 790, 805 (Tenn. 2001), that "the execution of mentally retarded persons" violated the Tennessee Constitution. In Van Tran, the court specifically concluded that the requirement of "significantly subaverage general intellectual functioning" in section 39-13-203(a)(1) should be proven through I.Q. scores on "standardized intelligence tests." Id. at 795. The court further concluded that the requirement of "deficits in adaptive behavior" in section 39-13-203(a)(2) specifically referred to:

how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socio-cultural background, and community setting. As discussed, a mentally retarded person will have significant limitations in at least two of the following basic skills: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. Influences on adaptive functioning may include the individual's education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation.

Id. (internal quotations and citation omitted). One year after Van Tran, the United States Supreme Court similarly held that the execution of "mentally retarded offenders" violated the Eight Amendment of the United States Constitution. Atkins v. Virginia, 536 U.S. 304, 321 (2002) (citing Ford v. Wainwright, 477 U.S. 399, 405 (1986)).

In Howell, 151 S.W.3d at 457, the Tennessee Supreme Court considered the petitioner's claim that the statute's incorporation of a "bright-line" requirement of an I.Q. score of seventy or below conflicted with "prevailing views of mental retardation in the field of psychology." However, the court held that the Tennessee legislature's decision to include a "bright-line" cutoff score of seventy provided "a clear and objective guideline to be followed by courts when applying the three-prong test as set out in Tennessee Code Annotated [section] 39-13-203(a) (2003)." Id. at 458. In reaching this decision, the court noted that section 39-13-203(a)(1) did not specify a specific test or testing method to be used in obtaining this I.Q. score. Id. at 459. While the court stated that the WAIS-III I.Q. test, or Wechsler Adult Intelligence Scale test, third edition, was the established standard for testing intellectual functioning, it recognized that other tests could also provide an accurate I.Q. score. Id. Finally, it concluded that while "[a] court may certainly give more weight to one test, [it] should do so only after fully analyzing and considering all evidence presented[,]" including evidence regarding all of the tests given to a defendant. Id.

In Strode, 232 S.W.3d at 16-18, the Tennessee Supreme Court held that: (1) an interlocutory appeal can be filed by the State following the trial court's determination that a defendant is "mentally retarded" and therefore ineligible for the death penalty pursuant to section 39-13-203; (2) the language in section 39-13-203(a) requiring that the "mental retardation" must have occurred "during the developmental period, or by eighteen (18) years of age" did not include a manifestation of "mental retardation" past the age of eighteen for both the significantly subaverage general intellectual functioning and the adaptive deficits prongs of the statute; and (3) the evidence preponderated against the trial court's finding that

the defendant had significantly subaverage general intellectual functioning before the age of eighteen. Moreover, the court stated that when a defendant is given an evidentiary hearing on the merits of a motion made in the trial court, the trial court's findings of fact are binding upon the appellate court unless the evidence contained in the record preponderates against those findings. Id. at 8 (citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Moore, 775 S.W.2d 372, 374 (Tenn. Crim. App. 1989)). The court noted that this standard "developed because the trial court, as the trier of fact, must assess the credibility of the witnesses, determine the weight and value to be afforded the evidence adduced during the hearing, and resolve any conflicts in the evidence." Id. (citing Odom, 928 S.W.2d at 23). However, it stated that "the application of the law to those facts is a question of law which this Court reviews de novo with no presumption of correctness." Id. (citing State v. Garcia, 123 S.W.3d 335, 343 (Tenn. 2003)). The court specifically concluded that "the question of whether an accused is mentally retarded for the purposes of application of the death penalty is a mixed question of law and fact." Id.

Recently, in Michael Angelo Coleman v. State, — S.W.3d — (Tenn. 2011), No. W2007–02767–SC–R11–PD, 2011 WL 1346932 (Tenn. April 11, 2011), the Tennessee Supreme Court held:

> We find that [Tennessee Code Annotated section] 39-13-203(a)(1) does not require that raw scores on I.Q. tests be accepted at their face value and that the courts may consider competent expert testimony showing that a test score does not accurately reflect a person's functional I.Q. or that the raw I.Q. test score is artificially inflated or deflated.

Id. at *1. In support of its holding, the court noted that there have been numerous cases where the State has argued that "raw I.Q. test scores" do not determine a defendant's "functional intelligence quotient." Id. at *19-20 (citing Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *22 (Tenn. Crim. App., at Jackson, July 1, 2009) (State's expert testified that he believed the petitioner's I.Q. was in the middle to high 80's, even though the petitioner had received a score of 73 on an I.Q. test), perm. to appeal denied (Tenn. Dec. 21, 2009); Strode, 232 S.W.3d at 5 (State's expert opined that "some of the test results suggested that the Defendant was not putting forth a full effort"); Smith v. State, No. E2007–00719–CCA–R3–PD, 2010 WL 3638033, at *30 (Tenn. Crim. App., at Knoxville, Sept. 21, 2010) (State's expert stated that an individual can "fake" a low I.Q. by malingering or purposely answering the questions incorrectly but cannot "fake" a high I.Q.; therefore, if an individual has high scores and low scores, the high scores are more reliable), perm. to appeal granted (Tenn. March 10, 2011). Specifically, the Coleman court concluded:

These cases reflect the parties' and the courts' existing awareness that, as a practical matter, a criminal defendant's "functional intelligence quotient" cannot be ascertained based only on raw I.Q. test scores. More importantly, they also reflect the parties' conclusion that [Tennessee Code Annotated section] 39-13-203(a) does not prevent them from presenting relevant and competent evidence, other than the defendant's raw I.Q. test scores, either to prove or to disprove that the defendant's "functional intelligence quotient" when the crime was committed was "seventy (70) or below." Our decision today confirms that this conclusion was entirely correct.

Id. at *20. The court also concluded that expert testimony should be considered when determining whether a defendant has adaptive behavior deficits pursuant to section 39-13-203(a)(2). Id. at *22. Finally, while acknowledging that it had not previously made a holding regarding the issue of causation in assessing adaptive deficits, the court concluded that it was error for courts to distinguish "causally between intellectual disability and mental illness" when considering whether a defendant had adaptive behavior deficits. Id. at *24.

## D. Review

### 1. Significantly Subaverage General Intellectual Functioning

The first prong of the statutory criteria for establishing intellectual disability requires that the defendant demonstrate significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below. See T.C.A. § 39-13-203(a)(1).

The record establishes that the Appellant was administered two intelligence tests, one at age sixteen and the second at age twenty-six. The tests reflect I.Q. scores of 66 and 68, respectively. Both scores fall below the bright-line score of seventy (70) as required by the statute. The Appellant contends that the trial court improperly employed a "standard error of measurement," in violation of Howell, and, in effect, increased the Appellant's scores above the bright-line cut-off of seventy (70). We disagree.

Pursuant to the Tennessee Supreme Court's recent decision in Michael Angelo Coleman, "[section] 39-13-203(a)(1) does not require that raw scores on I.Q. tests be accepted at their face value" and "courts may consider competent expert testimony showing that a test score does not accurately reflect a person's functional I.Q. or that the raw I.Q. test score is artificially inflated or deflated." Michael Angelo Coleman, — S.W.3d at —, 2011 WL 1346932, at *1. The lower court, in the instant case, appropriately considered all of the testimony of the expert witnesses, including the expert's opinions regarding whether the I.Q.

scores accurately reflected the Appellant's functional I.Q. The court also properly considered the social and educational history of the Appellant.

Both Dr. Rutledge and Dr. Craddock testified that the Appellant's attempts at the test were below his best possible effort. Dr. Craddock noted that the Appellant's responses were "quick" and that the Appellant appeared to be malingering based on his low performance scores and previous academic success. Moreover, Dr. Rutledge opined that the Appellant did not take the testing process seriously. Both Dr. Rutledge and Dr. Craddock indicated that the test results were an underestimate of the Appellant's actual mental ability. The record shows that the Appellant's elementary school records show final grades of an "excellent student," who scored consistently in the upper percentiles on standardized tests. In addition, the record shows that there were external explanations for the Appellant's academic decline, including the Appellant's drug use, his criminal activity, and the loss of four friends and a sibling. Finally, we cannot ignore the circumstances surrounding both the 1996 and 2006 tests. At the times that he took these tests, the Appellant was facing prosecution for very serious offenses and had an incentive to underestimate his mental ability. In contrast, when the Appellant wanted to learn small engine repair while incarcerated he was required to obtain his GED and to take the Beta Test. Under circumstances where the Appellant had an incentive to perform well, he received a score of 81, indicative of borderline intelligence functioning.

Upon careful review, we conclude that the trial court did not err in rejecting the scores from the Appellant's I.Q. tests. Based on the evidence presented, the I.Q. test results were at odds with the Appellant's previous academic success and were likely an underestimate of his intellectual ability as acknowledged by Dr. Rutledge and emphasized by Dr. Craddock. Moreover, as the trial court noted, external circumstances, including the Appellant's drug use, criminal behavior, and events of personal tragedy and loss sufficiently explained the Appellant's academic decline. Accordingly, we cannot conclude that the Appellant has established by a preponderance of the evidence a functional intelligence quotient of seventy (70) or below.

### 2. Deficits in Adaptive Behavior

As recently noted by the Tennessee Supreme Court in Michael Angelo Coleman, the Tennessee General Assembly has not defined what it means by "[d]eficits in adaptive behavior" in Tenn. Code Ann. § 39–13–203(a)(2). Michael Angelo Coleman, No. W2007-02767-SC-R11-PD, 2011 WL 1346932, at 20. The Tennessee Supreme Court and this court have consistently interpreted adaptive functioning, the second prong of the statutory criteria for establishing intellectual disability, as "'how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of

someone in their particular age group, socio-cultural background, and community setting.'" Van Tran, 66 S.W.2d at 795 (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 40 (4th ed. 1994)). An intellectually disabled individual will have "'significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" Id. (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39 (4th ed. 1994)). In addition, "[i]nfluences on adaptive functioning may include the individual's 'education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation.'" Id. ((quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 40 (4th ed. 1994)). The Tennessee Supreme Court has now held that a trial court's failure to consider expert testimony when determining whether a defendant has deficiencies in adaptive behavior pursuant to section 39-13-203(a)(2) is a fatal error. Michael Angelo Coleman, — S.W.3d at —, 2011 WL 1346932, at *22.

Although Michael Angelo Coleman requires courts to consider the testimony of experts regarding adaptive deficits, we note that a trial court need not limit itself to information provided by experts. The trial court may consider any information regarding the Appellant presented during prior proceedings in making a proper determination regarding intellectual disability. See Heck Van Tran v. State, No. W2005-01334-CCA-R3-PD, 2006 WL 3327828, at * 23 (Tenn. Crim. App., at Jackson, Nov. 9, 2006), perm. to appeal denied, (Tenn. Apr. 16, 2007) (citing In re: Anderson Hawthorne, Jr., 105 P.3d 552, 559 (Cal. 2005); Morrison v. State, 583 S.E.2d 873, 875 (Ga. 2003)). In other words, "the court may weigh and consider all evidence bearing on the issue of [intellectual disability]." Id. (citing In re: Anderson Hawthorne, Jr., 105 P.3d at 559).

In this case, the trial court determined that the Appellant failed to prove by a preponderance of the evidence that he had deficits in adaptive behavior. Specifically, the trial court noted that "[n]o deficits in adaptive behavior of the defendant were ever shown in the proof, either at trial or during the hearings on the motion." The Appellant disputes this finding of the trial court and cites to Dr. Rutledge's testimony that she was aware that the Appellant was unable to live independently, to retain employment, and to abide by community standards as evidenced by numerous arrests. The State responds that, as recognized by the trial court, Dr. Rutledge was unable to make such assertions regarding any deficits in adaptive behavior because she was only able to observe the Appellant during her one-hour screening of him in 1996. The State further asserts that Dr. Rutledge conceded that she could not state that the Appellant actually suffered from these deficits. Finally, the State

emphasizes that Dr. Craddock, at the post-trial hearing, testified that he was unable to identify any deficits in the Appellant's adaptive behavior.

Our review of this issue is challenged by the dearth of evidence offered to show that the Appellant suffered from any deficits in adaptive behavior. Neither of Drs. Rutledge or Craddock actually evaluated the Appellant for the purpose of discerning any deficits in adaptive behavior. Thus, the Appellant relies primarily on the testimony of his family members to establish that he was unable to live independently, unable to maintain employment, and unable to abide by community standards. The proof at trial and at the post-trial hearing fails to support the Appellant's claims.

First, while the record demonstrates that the Appellant lived with his sister and, after his sister refused to let him remain at her home, with his aunt, the record is absent any proof that the Appellant was not able to live independently. Next, the Appellant's mother testified inconsistently regarding the Appellant's employment history. She testified that he had "never held a job for more than a month" and that he "stayed working. He was doing fine." In a report to Dr. Craddock she explained that the Appellant was terminated because he was abusing his break privileges and not an inability to comprehend instructions. Moreover, Dr. Rutledge admitted on cross-examination that the Appellant was gainfully employed at the time he committed the offense in this case.

Finally, the Appellant asserts that he is unable to abide by community standards. The Appellant relies upon exclusively on his extensive history of arrests in support of this assertion. While the record does amply illustrate the Appellant's extensive criminal history, we reject the implication that an extensive history of criminal convictions is demonstrative of adaptive deficits. Furthermore, the record establishes, based on his school records, that the Appellant was able to abide by community standards. Thus, we conclude that the trial court's findings of fact are amply supported by the record. Accordingly, the Appellant has failed to establish by a preponderance of the evidence that he suffered from deficits in adaptive behavior.

### 3. Manifestation During Developmental Period

Finally, the Appellant must prove that his intellectual disability manifested by age eighteen. In other words, he must show that he had an I.Q. below seventy and had deficits in adaptive behavior by the age of eighteen. Intellectual disability has been defined as a "a developmental disability that becomes apparent before adulthood." Heller v. Doe, 509 U.S. 312, 321-22 (1993) (citing American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders 29 (3d rev. ed. 1987)). It has also been described as a disorder which "'has to have occurred during the developmental years, which means you are born with it or

in early childhood develop it.'" Strode, 232 S.W.3d at 13 (quoting Tenn. Senate Jud. Comm., Debate on Senate Bill 1851, March 13, 1990). Moreover, "'by the time a person [has] reached the age of eighteen, there should be a paper trail or a diagnosis or some evaluation [of intellectual disability] already there.'" Id. (quoting Tenn. Senate Jud. Comm., Debate on Senate Bill 1851, March 13, 1990).

The trial court found that "[a]s the defense has not proved its burden of showing either of the first two prongs by a preponderance of the evidence, it has also not shown that they were manifested by the time the defendant was 18 years of age." We agree. Because the proof does not establish by a preponderance of the evidence that the Appellant's I.Q. was below seventy (70) and that he demonstrated deficits in adaptive behavior, we conclude that no manifestation of intellectual disability was present by the age of eighteen. Accordingly, the Appellant is not entitled to relief regarding his claim that he is ineligible for the death penalty due to his intellectual disability. Upon our de novo review, we conclude that the trial court did not err in finding that the Appellant was not intellectually disabled pursuant to section 39-13-203(a).

## II. Sufficiency of the Evidence

The Appellant argues that the evidence presented at trial was insufficient to support his conviction for first degree felony murder. Specifically, the Appellant contends that the testimony of Taka Pruitt, the only witness to the incident other than the Appellant, "is largely in accord" with the Appellant's testimony, and to the extent that Taka Pruitt said the Appellant acted alone, her testimony is compromised because of her location and distance from the actual incident. Although the Appellant acknowledges that his initial intent was to steal a car, he claims that when he ran to the victim's car, he was going to the aid of Courtney Johnson, who was struggling with the victim. Moreover, he claims that he only drove away in the victim's vehicle because he was scared. Finally, although the Appellant admits that there is some evidence of his guilt, including circumstantial medical evidence and inconsistencies between his statement to police and his trial testimony, he claims this evidence should be viewed from the perspective that he "has, at best, borderline intellectual function[ing]."

In response, the State contends that the evidence was more than sufficient to support the conviction because the Appellant admitted at trial that he pushed the victim forcefully before stealing his car, and the evidence was undisputed that the victim subsequently died from his injuries. Regarding the Appellant's claim that he did not intend to take the victim's car, the State contends that this argument is not persuasive since Johnson testified that he was not involved in taking the victim's car and Taka Pruitt testified that the Appellant acted alone

during the incident. Finally, the State contends that any challenges to Taka Pruitt's vantage point during the incident are merely attempts to challenge her credibility, which was properly determined by the jury at trial. The State argues that medical evidence showed that the victim suffered repeated blows, which were not consistent with the Appellant's claim that he pushed the victim, causing the victim to fall. Moreover, it contends that the Appellant's actions following the crime, including driving the victim's car around while drinking and smoking marijuana and giving different explanations as to the ownership of the car, showed that the Appellant's intent in taking the victim's car was "more than transitory." We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from the evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt."

A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt; therefore, a defendant on appeal has the burden of showing that the evidence is insufficient to support the jury's verdict. State v. Thacker, 164 S.W.3d 208, 221 (Tenn. 2005) (citing State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)). A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in the State's favor. Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). Issues regarding the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the jury as the trier of fact, and this court does not reweigh or reevaluate the evidence. Id. (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

Despite the Appellant's arguments to the contrary, Taka Pruitt identified the Appellant as the sole perpetrator of the offense, and her testimony was corroborated by Courtney Johnson's testimony. "The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App., at Nashville, Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). This court has stated that the identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. Strickland, 885 S.W.2d at 87 (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). The Appellant contends that Taka Pruitt's testimony was unreliable because of her distance from the incident, the short time span in which the incident occurred, and the fact that she immediately ran inside the Apple Market after the incident. We decline the invitation to reweigh Taka Pruitt's testimony. It is the jury's responsibility, as the trier of fact, to evaluate the witnesses' credibility and to decide the defendant's guilt. We will not "reweigh or reevaluate the evidence." Bland, 958 S.W.2d at 659.

The Appellant also contends that the evidence is insufficient to support a conviction for first degree felony murder, arguing that there is no proof that he intended to rob the victim since he only took the victim's vehicle because he was "scared." First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." T.C.A. § 39-13-202(a)(2). In order to sustain the Appellant's conviction for felony murder, the State was required to prove that the Appellant killed the victim in the perpetration of a robbery. Id. § 39-13-202(a)(2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). "Although intent to kill is not required under the felony murder statute, the perpetrator must possess the requisite intent to commit the underlying felony for a felony murder conviction to be sustained." State v. John Dennis Rushing, No. 01C01-9501-CR-00020, 1996 WL 63920, at *6 (Tenn. Crim. App., at Nashville, Feb. 13, 1996), perm. to appeal denied (Tenn. July 22, 1996). In other words, a conviction for felony murder does not require a showing of premeditation or intent to kill; instead, it requires only a showing of a killing during the

perpetration of an underlying felony. See T.C.A. § 39-13-202(a)(2). Additionally, the death must occur "in the perpetration of" the enumerated felony. State v. Hinton, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000). "The killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). There is no requirement that "[t]he felony necessarily precede the murder in order to support a felony-murder conviction." Id. However, the Tennessee Supreme Court has held that the defendant must intend to commit the underlying felony at the time of the killing:

> Given the fact that the felony-murder rule is a legal fiction in which the intent and the malice to commit the underlying felony is "transferred" to elevate an unintentional killing to first-degree murder, we are reluctant to extend the doctrine to include cases in which there was no intent to commit the felony at the time of the killing. Thus, in a felony-murder case, intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim.

Id. at 107. If the underlying felony and killing were part of a continuous transaction with no break in the chain of events and the felon had not reached a place of temporary safety between the events, felony murder is sufficiently established. State v. Pierce, 23 S.W.3d 289, 294-97 (Tenn. 2000). Proof of the intention to commit the underlying felony, and at what point it existed, is a question of fact to be decided by the jury after consideration of all the facts and circumstances. Buggs, 995 S.W.2d at 107. "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. at 108 (citing State v. Addison, 973 S.W.2d 260, 266 (Tenn. Crim. App. 1997); State v. Johnson, 661 S.W.2d 854, 861 (Tenn. 1983); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

In arguing that he lacked intent to commit the robbery, the Appellant essentially asks this Court to adopt his version of the incident, namely that he and Courtney Johnson went to the Apple Market in order to steal a car, that the Appellant threw the victim to the pavement in order to help Johnson, who was scuffling with the victim, and that the Appellant drove away alone in the victim's vehicle because he was scared. The Appellant attributes any inconsistencies between his statement to the police and his testimony at trial to his low level of intellectual functioning.

We note that the jury was presented with the Appellant's version of the events regarding the incident and ultimately rejected it. This proof presented at trial is sufficient to support the Appellant's conviction for felony murder committed during the perpetration of a robbery. The Appellant is not entitled to relief on this issue.

## III. Introduction of Photographs of Victim

The Appellant argues that the trial court abused its discretion in admitting the photographs from the victim's autopsy. First, he contends that the photographs are cumulative and of little probative value, given the admission of the medical examiner's diagrams and the expert medical testimony regarding the victim's injuries that "explain the nature and extent of [the] victim's injuries without the prejudicial emotional impact of the photographs." Second, the Appellant contends that the photographs, specifically Exhibits 33 and 39, were unfairly prejudicial pursuant to Rule 403 because they depicted injuries from medical intervention and injuries that were worsened by the victim's fragility, due to his prior medical conditions including senile ecchymosis and coagulopathy.

In response, the State initially notes that many of the photographs it offered were not admitted or were cropped in order to make them admissible. Moreover, it asserts that the photographs that were admitted were relevant to the issues in this case. The State argues that the diagrams alone were insufficient to explain the cause of the victim's injuries and omitted some injuries. Moreover, the State asserts that the medical examiner's testimony would have been difficult for the jury to understand without the admission of the photographs, since the testimony was tied so closely with the photographs. The State also argues that the photographs admitted were necessary to show the extensiveness of the victim's injuries and to establish that the victim was beaten. Furthermore, despite their number, the State argues that the subject matter of the "photographs only scarcely overlap[ped]." Regarding the argument that certain photographs were unfairly prejudicial, the State responds that the admitted photographs were not gruesome, and the medical examiner specifically identified the stitches and bruises that were the result of medical intervention. As to the argument that the photographs were unfairly prejudicial because they showed injuries worsened by the victim's fragility, the State responds that criminal defendants must take their victims as they find them. Cf. Odeneal v. State, 157 S.W. 419, 421 (Tenn. 1913) ("One who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury, whether the sequence be direct or through the operation of intermediate agencies dependent upon and arising out of the original cause.").

During a hearing outside the presence of the jury during the guilt phase of the Appellant's trial, the trial court evaluated the admissibility of specific photographs taken during the victim's autopsy. The Appellant objected on the grounds that the photographs were cumulative to other proof and that their probative value was outweighed by unfair prejudice. The trial court overruled the Appellant's objections to the cumulative nature of the photographs, finding that the court had already "rejected two pictures . . . that were close-ups that we're not going to put in, but each one of these [photographs] has a different part of the body that was not shown in the others, so I'm going to overrule your objection." The trial court further found that "the probative value is not outweighed by unfair prejudice."

The defense objected to the following photographs at trial, and their admission is contested on appeal:

| Exhibit # | Description |
| --- | --- |
| 32 | Close-up of victim's face depicting injuries, i.e., hemorrhaging, to eyes, and scrape to forehead. Injuries result of skull fractures. |
| 33 | View of right side of victim's head, depicting staples and incision after brain surgery. Photo also depicts ecchymosis around eye. |
| 34 | View of left side of victim's head, depicting injury and bruising to left ear and bruising to left shoulder |
| 35 | Close-up view of injury and bruising to left shoulder |
| 36 | Close-up view of inside of lower lip depicting injury to lip |
| 37 | Close-up view of inside of upper lip depicting injury to lip |
| 38 | View of right side of victim's torso depicting injury and bruising to rib cage/abdomen area |
| 39 | View of anterior part of neck and upper left shoulder |
| 40 | View of bruising and injury to left armpit area - near location of rib fractures and clavicular fracture |
| 41 | View of injury to lower right side of chest |
| 42 | Close-up view of injury and bruising to inside of victim's left wrist |
| 43 | Close-up view of injury and bruising to top of victim's right hand |

| 44 | View of bruising and injury to inside of victim's left arm |
|---|---|
| 45 | View of bruising, tears and injury to top portion of victim's left arm including elbow |
| 46 | View of injury to victim's left arm including top of hand |
| 47 | View of injury and bruising to inside and top of victim's right arm and wrist |
| 48 | View of top of victim's right hand showing bruise over knuckle |
| 49 | View of injury and bruising to inside of victim's right arm and elbow |
| 50 | View of injury and bruising to victim's right arm |
| 51 | View of injury and bruising to victim's right upper arm |
| 52 | View of injury to victim's right hand and wrist |
| 53 | View of injury to victim's left knee |
| 54 | View of injury to inside of victim's right ankle |
| 55 | Cropped picture of victim's left knee |

The aforementioned twenty-four color photographs were admitted into evidence, and Dr. Chancellor described the injuries depicted in each photograph. She stated that she was unable to provide the order in which the injuries were inflicted. However, she opined that the injuries were the result of blunt force and were sustained very close in time.

The trial court has discretion regarding the admissibility of photographs, and a ruling on this issue "will not be overturned on appeal except upon a clear showing of abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). First, a photograph must be "verified and authenticated by a witness with knowledge of the facts" before it can be admitted into evidence. Id. Second, a photograph must be relevant to an issue that the jury must determine before it may be admitted. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998) (citing State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); Banks, 564 S.W.2d at 951 (Tenn. 1978)). However, if the photograph's "prejudicial effect outweighs its probative value," it should not be admitted. Tenn. R. Evid. 401 and 403; Banks, 564 S.W.2d at 951. A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative

evidence." <u>Banks</u>, 564 S.W.2d at 951. Unfair prejudice has been defined by the Tennessee Supreme Court as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." <u>Id.</u> Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." <u>Id.</u>

There is nothing gruesome, graphic, or horrifying about these pictures. <u>Compare</u> <u>Banks</u>, 564 S.W.2d at 950-51 (citing <u>People v. Jenko</u>, 102 N.E.2d 783, 785 (Ill. 1951)) ("[P]hotographs of [a] corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character."). Furthermore, nothing in the photographs would confuse or mislead the jury, waste the court's time, or be redundant. <u>See</u> Tenn. R. Evid. 403; <u>Banks</u>, 564 S.W.2d at 951.

Exhibits 32 through 55 depict the numerous injuries sustained by the victim. Dr. Chancellor appropriately described the injuries and specified the injuries resulting from surgical or medical intervention. The photographs admitted by the trial court were relevant to supplement the testimony of the medical examiner. <u>See generally</u> <u>State v. Cole</u>, 155 S.W.3d 885, 913 (Tenn. 2005) (Appendix) ("The photographs were relevant to supplement the testimony of the medical examiner that this wound was inflicted from contact range, from which a jury could infer premeditation, and not from a few feet away as claimed by the defendant during his statement to the police."). We conclude that the probative value of the photographs was not outweighed by their prejudicial effect, and the trial court did not abuse its discretion in allowing their admission. Further, we conclude that it does not affirmatively appear that the admission of the photographs affected the result of the Appellant's trial. <u>See</u> <u>Banks</u>, 564 S.W.2d at 953 ("Following an examination of the entire record in this case, we are of the opinion that it does not affirmatively appear that the error in admission of the photographs has affected the results of the trial."). The Appellant is not entitled to relief on this issue.

### IV. Constitutionality of (i)(7) Aggravating Circumstance

The Appellant contends that the (i)(7) aggravating circumstance is unconstitutional pursuant to <u>State v. Middlebrooks</u>, 840 S.W.2d 346 (Tenn. 1992), <u>superseded by statute as</u> <u>recognized in</u> <u>State v. Stout</u>, 46 S.W.3d 689 (Tenn. 2001). He argues that "while the sentencing statute as amended does narrow the class of death eligible defendants within the class of those convicted of felony murder by requiring that the murder be knowingly committed[] and that the defendant have a substantial role in the underlying felony[, the (i)(7) aggravating circumstance] maintains a disproportionate risk of death to felony murder defendants when compared with that risk to defendants convicted of premeditated murder."

He adds that "it was just that disproportionate risk that concerned the <u>Middlebrooks</u> court and which lies at the heart of the statute's constitutional infirmity."

In response, the State argues that the Appellant's argument regarding the constitutionality of the (i)(7) aggravating circumstance was recognized by the Tennessee Supreme Court's ruling in <u>State v. Stout</u>, 46 S.W.3d 689 (Tenn. 2001), <u>superseded by statute on other grounds as recognized in</u> <u>State v. Odom</u>, 137 S.W.3d 572 (Tenn. 2004). We agree that the Appellant is not entitled to relief on this issue.

In 1992, the Tennessee Supreme Court in <u>Middlebrooks</u> held that the (i)(7) felony murder aggravating circumstance, as it existed at the time, essentially duplicated the elements of the felony murder statute and did not sufficiently narrow the class of convicted defendants eligible for the death penalty in compliance with the Eighth Amendment of the United States Constitution. <u>Middlebrooks</u>, 840 S.W.2d at 346. In 1995, the Tennessee General Assembly, in response to the <u>Middlebrooks</u> decision, amended the aggravating circumstance in section 39-13-204(i)(7) to require that the murder "was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit" one of the specified felonies. T.C.A. § 39-13-204 (Supp. 1995). Effectively, "[t]his amendment narrowed the class of offenders to whom the death penalty could be applied sufficiently so as to leave no <u>State v. Middlebrooks</u> problem even in cases where [Tennessee Code Annotated section] 39–13–204(i)(7) was the only aggravating circumstance established and the conviction was for felony murder." <u>State v. Banks</u>, 271 S.W.3d 90, 152 (Tenn. 2008) (citing <u>State v. Reid</u>, 91 S.W.3d 247, 306 n.13 (Tenn. 2002) (appendix)). The law is settled that the current versions of the felony murder statute and the (i)(7) felony murder aggravating circumstance are constitutionally sound:

> Unlike the statutes analyzed in <u>Middlebrooks</u>, the present versions of felony murder and the felony murder aggravating circumstance do not duplicate the elements of one another. The aggravating circumstance applies only where the jury finds that a defendant acted <u>knowingly</u> and had <u>a substantial role</u> in the offense. The additional elements were not in the prior version of the felony murder aggravating circumstance. In short, the present statutory scheme eliminates the duplication that was at issue in <u>Middlebrooks</u> and thus achieves the constitutionally required narrowing of death-eligible offenders convicted of felony murder.

<u>Stout</u>, 46 S.W.3d at 706.

We conclude, pursuant to established precedent on this issue, that the (i)(7) aggravating circumstance sufficiently narrows the pool of death-eligible defendants. Cf. State v. Leach, 148 S.W.3d 42, 68 (Tenn. 2004) (Although the Appellant acknowledged that the (i)(7) aggravating circumstance was amended to add the "knowing" element, he requested that the Tennessee Supreme Court "adopt a position contrary to that currently held by the courts of this state[,]" which the court refused to do.). Accordingly, the Appellant is not entitled to relief on this issue.

## V. Sufficiency of (i)(7) Aggravating Factor

The Appellant next contends that the evidence is insufficient to support the application of the (i)(7) aggravating circumstance. He argues that "[n]othing in the proof supports the conclusion that Appellant knowingly committed a murder." He further argues that although "the medical evidence does not conclusively indicate [the] Appellant's intent, the victim's injuries were not inconsistent with his having been thrown to the ground."

In response, the State contends that whether a defendant "knowingly" killed the victim is a question of fact for the jury. Citing State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010), the State asserts that a jury can infer a defendant's intent, including whether he acted "knowingly," from the facts and circumstances surrounding the offense. In addition, the State argues that the severity of the victim's injuries "can support a rational inference that [the] defendant was aware that his conduct was reasonably certain to cause the victim's death and, therefore, that he knowingly killed him." Finally, the State contends that the Appellant's argument focuses on accrediting Dr. Smith's testimony that the majority of the victim's injuries could have been caused by a fall to his left side, even though the record contains substantial evidence to the contrary. We agree with the State.

In order for a defendant to receive the death penalty, the jury must unanimously determine that the State has proven beyond reasonable doubt one or more of the aggravating circumstances in section 39-13-204(i). See T.C.A. § 39-13-204(g)(1). Here, the jury determined that the State had proved the presence of three aggravating circumstances. See id. §§ 39-13-204(i)(2), (7), and (14).

"In addressing whether the evidence is sufficient to support a jury's finding of the existence of an aggravating circumstance, our standard of review is framed by taking the facts in a light most favorable to the State and by considering whether a rational trier of fact could have found the existence of an aggravating circumstance beyond a reasonable doubt." Banks, 271 S.W.3d at 148-49 (citing Reid, 164 S.W.3d at 314; Terry v. State, 46 S.W.3d 147, 160–61 (Tenn. 2001)). This court has an obligation to consider the sufficiency of the evidence supporting the aggravated circumstances found by the jury regardless of whether

the defendant explicitly raises this issue.  <u>Id.</u> at 149 (citing T.C.A. § 39–13–206(c)(1)(B); <u>Reid</u>, 164 S.W.3d at 314).

Here, the Appellant argues that the evidence is insufficient to support the application of the (i)(7) aggravating circumstance.  The (i)(7) felony murder aggravating circumstance is established where:

> [t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb[.]

T.C.A. § 39-13-204(i)(7).  The proof in this case, in the light most favorable to the State, establishes that the Appellant ambushed the victim, pushed him into his car, and fell on top of the victim.  An eyewitness observed the victim's legs dangling from the vehicle while the Appellant was on top of him and then observed the Appellant throw the victim to the ground. The severe nature of the victim's injuries and the findings of the medical examiner support the conclusion that the Appellant inflicted numerous blows to the elderly victim.  Because the Appellant was aware that his conduct was reasonably certain to cause the victim's death, it was reasonable for the trier of fact to determine that the Appellant knowingly killed the victim.  Following the assault, the Appellant drove away in the victim's car, attempted to conceal the car, and admitted that that he intended to sell the parts from the victim's car. Viewing the facts in the light most favorable to the State, we conclude that a rational trier of fact would have found the existence of this aggravating circumstance.  The Appellant is not entitled to relief as to this claim.

## VI. Mandatory Review

The Appellant argues that his death sentence is arbitrary and disproportionate.  He claims that his impaired intellectual ability and remorse are "compelling mitigation." He also maintains that the victim's "murder was an unintended consequence" of the underlying felony of robbery.  The State responds that abundant case law reflects that the Appellant's sentence was not arbitrary, excessive, or disproportionate.  We agree with the State.

Pursuant to Tennessee Code Annotated section 39-13-206(c)(1), this court must review the application of the death penalty to determine whether:

(A)     The sentence of death was imposed in any arbitrary fashion;

(B)     The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C)     The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

(D)     The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Id. § 39-13-206(c)(1).

## 1. Arbitrariness

The death penalty is not imposed in an arbitrary fashion so long as the defendant's trial "was conducted pursuant to the procedure established in the applicable statutory provisions and rules of criminal procedure." State v. Young, 196 S.W.3d 85, 115 (Tenn. 2006). After carefully reviewing the record, we conclude that the sentence of death was not imposed in an arbitrary fashion.

## 2. Sufficiency of Statutory Aggravating Circumstances Found by the Jury

The jury found that the proof established three statutory aggravating circumstances, i.e., that the defendant was previously convicted of one or more felonies involving the use of violence; that the murder was knowingly committed while the defendant had a substantial role in committing a robbery; and the victim of the murder was seventy (70) years or older, beyond a reasonable doubt. T.C.A. § 39-13-204(i)(2), (7), (14). We must review the evidence supporting these aggravating circumstances in the light most favorable to the State and must determine whether a rational trier of fact could have found the existence of these aggravating circumstances beyond a reasonable doubt. State v. Kiser, 284 S.W.3d 227, 272 (Tenn. 2009) (citing State v. Bane, 57 S.W.3d 411, 426 (Tenn. 2001)). Upon careful review, we conclude that there was sufficient evidence to support the jury's finding regarding each of the three aggravating circumstances. We have previously determined that the evidence is sufficient to support the application of the (i)(7) statutory aggravating circumstance in this case.

The jury also found the proof supported the (i)(2), prior violent felony aggravating circumstance relied upon by the State. See T.C.A. § 39-13-204(i)(2). During the penalty phase, the State presented proof that the Appellant was convicted on March 7, 2003, of robbery and attempted robbery and received sentences of three years and two years respectively. The proof also revealed that on September 27, 1997, and September 29, 1997, the Appellant was convicted of three counts of aggravated robbery. For each of these convictions, he received a sentence of eight years. The jury's verdict reflects that it found that the State had proven the presence of the prior violent felony conviction aggravating circumstance beyond a reasonable doubt, and the record supports this finding. We conclude that the State's evidence was sufficient to establish the (i)(2) aggravating circumstance. See id. § 39-13-204(i)(2).

In addition, the jury found the proof supported the (i)(14) aggravating circumstance that "[t]he murder victim was seventy (70) years of age or older." Id. § 39-13-204(i)(14). Witnesses for the State testified that the victim was seventy-nine years old at the time of his murder. This uncontested proof is more than sufficient to support the jury's finding of the (i)(14) aggravating circumstance. Accordingly, after reviewing the record in the light most favorable to the State, we conclude that a rational trier of fact could have found the existence of all three of the aforementioned aggravating circumstances.

### 3. Totality of Aggravating Circumstances Applied

The Appellant offered the following mitigating circumstances: (1) his capacity to appreciate the wrongfulness of his conduct or conform his misconduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication, which was insufficient to establish a defense to the crime but which substantially affected his judgment; (2) his youth at the time of the crime; (3) his family's expression of love and support for him; (4) his formal education was limited to completing the seventh grade of school; (5) his father had never been a part of his life; (6) his family for three generations may have suffered from mental illness and drug/alcohol addiction; (7) his mother was arrested for receiving stolen property when he was two years old and was arrested many times thereafter; (8) he has significant deficits in his adaptive behavior; (9) his I.Q. has been measured at 66, and he was diagnosed as "mildly mentally retarded" when he was sixteen years old; (10) he was diagnosed as "mildly mentally retarded" by the MTMHI; (11) he suffers from schizophrenia, has made suicide attempts, and has a family history of schizophrenia; (12) he has expressed pressure and stressors leading up to the crime; (13) he did not intentionally kill the victim; (14) he did not premeditatively kill the victim; (15) our social system failed to protect and school him; (16) our mental health system failed to treat him; (17) he was neglected and abandoned during his childhood; (18) he was traumatized by

-48-

loss during his childhood; (19) he has expressed remorse for his actions; (20) any residual doubt concerning his guilt or intent; (21) he was possibly prenatally exposed to drugs and alcohol; (22) the impact of his execution upon his family members; (23) any other mitigating circumstance which is raised by the evidence, produced by either the State or the Defense at either the guilt or sentencing hearing, including any aspect of his character or record or any aspect of the circumstances of the offense favorable to him which were supported by the evidence. See generally id. § 39-13-204(j)(7), (8), (9). Upon review, we conclude that the evidence supports the finding of the jury that the three aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

### 4. Proportionality

Pursuant to Tennessee Code Annotated section 39-13-206(c)(1)(D) and Bland, 958 S.W.2d at 661-74, this court is required to consider whether the Appellant's sentence of death is disproportionate to the penalty imposed in similar cases. State v. Godsey, 60 S.W.3d 759, 781-82 (Tenn. 2001). This review is designed to "'identify and invalidate the aberrant death sentence.'" Thacker, 164 S.W.3d at 233 (quoting Bland, 958 S.W.2d at 665). A sentence of death is aberrant in a particular case if it is "'disproportionate to the punishment imposed on others convicted of the same crime.'" Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 43 (1984)). "[T]he sentence of death is not disproportionate, unless, the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Bland, 958 S.W.2d at 668.

This court must use a "'precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes.'" State v. Copeland, 226 S.W.3d 287, 305 (Tenn. 2007) (quoting State v. Davis, 141 S.W.3d 600, 619-20 (Tenn. 2004)). The pool of cases considered must be cases in which a capital sentencing hearing was conducted and the jury determined whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. State v. Rice, 184 S.W.3d 646, 679 (Tenn. 2006). "[W]e begin with the presumption that the sentence of death is proportionate to the crime of first degree murder." State v. Hall, 958 S.W.2d 679, 699 (Tenn. 1997)). In conducting this comparative proportionality review, this court must consider "the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved." Terry, 46 S.W.3d at 164. Regarding the nature of the crime, numerous factors are considered, including:

"(1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the

absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect on non-decedent victims."

State v. Reid, 213 S.W.3d 792, 820 (Tenn. 2006) (quoting Davis, 141 S.W.3d at 620). This court must also consider the defendant's: "(1) prior criminal record; (2) age, race, and gender; (3) mental, emotional, or physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." Id. (quoting Davis, 141 S.W.3d at 620). In conducting our review, we remain cognizant of the fact that "no two cases involve identical circumstances." Terry, 46 S.W.3d at 164. Thus, "our objective cannot be to limit our comparison to those cases where a defendant's death sentence 'is perfectly symmetrical,' but only 'to identify and to invalidate the aberrant death sentence.'" Id. (quoting Bland, 958 S.W.2d at 665).

In this case, the evidence presented at trial established that the twenty-five-year old Appellant planned on stealing a car from a woman before arriving at the Apple Market. The Appellant unsuccessfully attempted to persuade sixteen-year-old Courtney Johnson to participate in the robbery. At the market, the Appellant waited outside the store, watching for vulnerable women, but none appeared. The Appellant then saw his opportunity as the seventy-nine-year-old male victim exited the store. The Appellant chased the victim and pushed him into the vehicle, where the Appellant began beating him. The Appellant then threw the victim to the pavement and drove away in the victim's car. The evidence showed that the victim later died as a result of the injuries sustained during the beating. For several days after the incident, the Appellant drove around in the victim's car, provided rides to acquaintances, and concocted various stories as to the ownership of the vehicle. During this time, the Appellant was careful to park the car in a manner that prevented easy detection of the license plate. The Appellant admitted that he had planned on selling parts from the stolen vehicle. He ultimately turned himself into the police, at which time he expressed remorse over his actions. The Appellant also presented evidence of borderline intellectual functioning, but this evidence directly contradicted the Appellant's school records, which indicated a student who was able to perform in the ninetieth percentiles on standardized tests. Evidence was presented showing the Appellant's extensive criminal history. Moreover, the jury was able to consider the facts of the incident, including the Appellant's actions following the robbery.

The death sentence has been upheld under similar facts and under application of similar statutory aggravating circumstances to those found in the instant case. See, e.g., State v. Rollins, 188 S.W.3d 553, 571-77 (Tenn. 2006) (defendant stabbed to death eighty-one-year-old shop owner in the course of a robbery, inflicting more than twenty non-fatal, painful stab wounds while the victim was alive, conscious, and retreating before cutting the victim's carotid artery and jugular vein; death sentence upheld based on (i)(5)-(7), and

(i)(14)); Leach, 148 S.W.3d at 59-60 (defendant raped one of the victims and beat, stabbed, and strangled both elderly women; murders were committed during the robbery of the home; death sentence upheld based upon (i)(2), (i)(5), (i)(7), and (i)(14) (only as to one victim)); State v. Mann, 959 S.W.2d 503 (Tenn. 1997) (young defendant broke into home of elderly victim and beat, raped, and killed victim; death penalty upheld based upon (i)(5) and (i)(7)); State v. Bush, 942 S.W.2d 489, 507 (Tenn. 1997) (young defendant broke into home of elderly victim and beat and stabbed her to death; death penalty upheld based upon (i)(5) and (i)(7)); State v. Barber, 753 S.W.2d 659, 668-69 (Tenn. 1988) (young defendant beat elderly woman to death during burglary; death sentence upheld based upon (i)(5) and (i)(7)); State v. McNish, 727 S.W.2d 490, 491-94 (Tenn. 1987) (defendant bludgeoned elderly widow to death during robbery; aggravating circumstance (i)(5)); State v. Barnes, 703 S.W.2d 611, 612-14 (Tenn. 1985) (defendant beat elderly woman during burglary of her house, victim died of complications from pneumonia resulting from beating; aggravating circumstances (i)(2), (i)(5), and (i)(7)); State v. Campbell, 664 S.W.2d 281, 282-84 (Tenn. 1984) (defendant beat elderly man to death during a robbery and was sentenced to death upon finding of (i)(2), (i)(5), and (i)(7) aggravating circumstances).

The death sentence has also been upheld in cases based only upon the (i)(2) aggravating circumstance of prior violent felony convictions. See, e.g., State v. Faulkner, 154 S.W.3d 48, 63 (Tenn. 2005) (prior convictions for second degree murder, assault with intent to commit first degree murder, assault with intent to commit robbery, assault with intent to commit voluntary manslaughter, and robbery); State v. McKinney, 74 S.W.3d 291, 300 (Tenn. 2002) (prior guilty plea to aggravated robbery); State v. Chalmers, 28 S.W.3d 913, 916 (Tenn. 2000) (prior convictions for attempted especially aggravated robbery and attempted first degree murder); State v. Keough, 18 S.W.3d 175, 184 (Tenn. 2000) (prior convictions for assault to commit voluntary manslaughter and manslaughter); State v. Smith, 993 S.W.2d 6, 18-21 (Tenn. 1999) (prior conviction for first degree murder and two prior convictions for robbery). The prior violent felony factor is an aggravating circumstance that the Tennessee Supreme Court has described as "'more qualitatively persuasive and objectively reliable than others.'" McKinney, 74 S.W.3d at 313 (quoting State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993)).

Having compared the circumstances of the present case with the circumstances of the cases cited above and others not herein detailed, we conclude that this case, taken as a whole, is not "plainly lacking in circumstances consistent with other similar cases in which the death penalty has been imposed." Bland, 958 S.W.2d at 668. We further conclude that the mitigating circumstances presented by the Appellant are insufficient to distinguish his case from the aforementioned cases. Thus, considering the circumstances of the crime, the Appellant, and the aggravating and mitigating circumstances, the Appellant's sentence of death is not disproportionate, excessive, or arbitrary.

**CONCLUSION**

In accordance with the mandate of Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this case and conclude that the sentence of death was not imposed arbitrarily. The evidence supports the jury's finding of the (i)(2), (i)(7), and (i)(14) statutory aggravating circumstances as to the murder of the victim. Moreover, the evidence supports the jury's finding that the application of these enumerated aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. See T.C.A. § 39-13-206(c)(1). A comparative proportionality review, considering the nature of the crime, the defendant, and the aggravating and mitigating circumstances, convinces us that the sentence of death was neither excessive nor disproportionate to the penalty imposed in similar cases. See Terry, 46 S.W.3d at 164. Accordingly, we affirm the Appellant's conviction for first degree felony murder and the resulting sentence of death by lethal injection. It appearing that the Appellant, Corinio Pruitt, is indigent, the costs of this appeal are taxed to the State.

_____
CAMILLE R. MCMULLEN, JUDGE